```
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO


Civil Action No. 16-CV-00648-RPM
_____

VIDEO DEPOSITION OF ERNEST APPLEGATE
September 19, 2016
_____

RETHA APPLEGATE and ERNEST APPLEGATE,
Plaintiffs,
vs.
HEATH CONSULTANTS, INC.,
Defendant.
_____


APPEARANCES:
     LAW OFFICE OF JOHN MCKENDREE
          By John McKendree, Esq.
              44 Cook Street, Suite 100
              Denver, Colorado  80206
                Appearing on behalf of Plaintiffs
     COZEN O'CONNOR
          By David L. Barron, Esq.
              1221 McKinney Street, Suite 2900
              Houston, Texas  77010
                Appearing on behalf of Defendant
Also Present: Nicholas F. Borgia, CLVS
              Retha Applegate
              Shanna Waterson
              Mary Oliveros
              Isaid Gallego
```

EXHIBIT A

**Page 30**

1  I think those are sufficient reasons
2  for --
3  Q  Okay.
4  A  -- stress.
5  Q  Your job before that would have been
6  the Lakewood Police Department job?
7  A  Yes.
8  Q  And you would have been unemployed for
9  a period of time after you left the Lakewood
10 Police Department.
11     Is that fair?
12 A  I would say the unemployment period
13 would have been from leaving Lakewood to Werner.
14 Q  Was your work -- wife working during
15 that time period?
16 A  No.  I think her last job was the high
17 school.
18 Q  So you were both unemployed for a
19 period of time?
20 A  For an extensive period of time.
21 Q  All right.  Let's talk about Lakewood.
22 You worked there for almost 20 years?
23 A  Well, at least 20 years.
24 Q  Okay.  Why'd you leave?
25 A  The job was very stressful, and I did

**Page 31**

1  not feel that I was being supported in the kind of
2  decisions that had to be made.
3  Q  What do you mean by that?
4  A  At the time, I worked for a sergeant
5  who did not value his employees.
6  Q  Walk me through your positions that you
7  held at the Lakewood Police Department.
8  A  Well, at Lakewood, I started out as a
9  patrol officer.
10 Q  How long were you a patrol officer?
11 A  Oh, man.  I loved patrol, so probably
12 my entire career at Lakewood, except for the year
13 that I was a crimes against children detective.
14 Q  Did you have to go through the police
15 academy or some training --
16 A  Oh, yeah.
17 Q  -- to be a police officer?
18 A  Well, let me rephrase that.  I was a
19 lateral transfer into Lakewood, meaning that I had
20 previous police experience.  And so going over to
21 Lakewood, the training was condensed, shortened.
22 Q  And that previous experience was with
23 the Adams County Sheriff's Office?
24 A  Yes, sir.
25 Q  You worked there for about five years?

**Page 32**

1  A  5-1/2, yes, sir.
2  Q  Why'd you leave there?
3  A  I felt there was better opportunity.
4  Lakewood was basically, and still is, known for
5  producing police chiefs.  That was one of the
6  goals I had.  I basically felt that I could leave
7  a smaller pond, go to a bigger one --  And at the
8  time, did -- I made money on the transfer.
9  Q  Were you happy in your job at
10 Adams County?
11 A  It was stressful, too.
12 Q  Did you get along with your supervisor?
13 A  I believe so.  You know, in shift work,
14 your supervisors continually change --
15 Q  Right.
16 A  -- so, yeah.
17 Q  Did you ever receive any negative
18 performance evaluations at Adams County?
19 A  I don't recall negative ones.
20 Q  Okay.
21 A  Well, I -- I take that back.  There is
22 one situation where a -- in transporting a
23 prisoner, a jailer felt that my actions were
24 inappropriate.
25 Q  In what way?

**Page 33**

1  A  Well, I guess he perceived that I
2  was --  I don't know.  That was what was confusing
3  on it.  Basically --  Can I tell you what
4  happened?
5  Q  Sure.
6  A  Transporting an out-of-control drunk
7  threatening to kill me, et cetera, et cetera.  And
8  he was --  In the front seat is how we transported
9  at Lakewood.  No.  Because he was --
10 Q  This was in Adams County?
11 A  Adams County --  I believe he was in
12 the backseat.  And in the process of getting him
13 out, when I lifted him out of the car
14 (indicating), he was probably about 4 inches off
15 the ground, and he was --  He dropped from my
16 hands 4 inches off the ground.
17 Q  So he fell into the dirt or the
18 concrete or --
19 A  No.
20 Q  -- whatever it was?
21 A  He didn't fall.  It wasn't --  It was
22 the sally port garage area, and it wasn't
23 carpeted, but it wasn't rough either.  He was not
24 injured, but the deputy -- the deputy -- the
25 jailer felt that was inappropriate.

**Page 34**

1   Q   Okay. Let's talk about Lakewood.
2   A   Okay.
3   Q   You chose to retire?
4   A   Yeah.
5       (Exhibit 1 marked.)
6   Q   (By Mr. Barron) Mr. Applegate, I've
7   handed you what's been marked as Exhibit 1 to your
8   deposition. Is that your notice that you wanted
9   to retire?
10  A   It's initialed by me, has my former
11  badge number. Yes, sir.
12  Q   And that's December of 2008?
13  A   Yep.
14  Q   Why did you choose to retire at that
15  particular moment?
16  A   It became apparent that I no longer
17  could continue with police work. It was affecting
18  my health, and the plan was to relocate to Florida
19  and build a house.
20  Q   So why didn't you move to Florida and
21  build a house?
22  A   You can't move if you can't sell your
23  house. It took me three years.
24  Q   To sell your house in Colorado?
25  A   Yeah.

**Page 35**

1   Q   Okay.
2   A   Unfortunately, I chose to retire at the
3   same time the housing market collapsed.
4   Q   Bad timing.
5   A   Yeah. Unfortunately, I've been prone
6   to do that.
7   Q   Sir, isn't it true that right before
8   you chose to retire from Lakewood, you received a
9   very negative performance evaluation?
10  A   I would say that that was an impetus
11  for retiring, yes, sir.
12  Q   And you were not getting along with
13  your supervisor at the time, right?
14  A   I could not trust my supervisor.
15      (Exhibit 2 marked.)
16  Q   (By Mr. Barron) Mr. Applegate, I've
17  handed you what's been marked as Exhibit 2 --
18  A   Uh-huh.
19  Q   -- to your deposition. And I'll
20  represent to you that this is a document that we
21  retrieved from the City of Lakewood personnel file
22  for you.
23  A   Okay.
24  Q   And it appears to be a performance
25  review from 2008 for employee Ernie Applegate by

**Page 36**

1   Jeffrey Rogers, sergeant.
2       Does that look right?
3   A   Jeffrey Rogers has since retired. He's
4   now a minister of the Lord.
5   Q   Okay. Was he the supervisor you were
6   talking about a minute ago that you couldn't
7   trust?
8   A   Yes, sir.
9   Q   All right. And why didn't you feel
10  like you could trust him?
11  A   Based primarily on this evaluation,
12  sir.
13  Q   Well, let's look at it. On Page 2 of
14  the exhibit -- And I'm -- Instead of using page
15  numbers, it's sometimes easier to use what we call
16  Bates numbers. So if you look in the bottom
17  right-hand corner, every page has a number on it.
18  And the one I want you to look at is -1110 --
19  -1110. If you look in the bottom right-hand
20  corner --
21  A   Yes.
22  Q   -- JWM/Applegate, and then it has
23  -01110.
24      See that?
25  A   Yes, sir.

**Page 37**

1   Q   All right. And your overall rating was
2   successful.
3       See that?
4   A   Yes, sir.
5   Q   And if you look in the first paragraph
6   of the narrative there, about four lines down, it
7   says, "There were however occasional moments of
8   concern involving his communications. Agent
9   Applegate wears his emotions on his sleeve and
10  sometimes reacts verbally without fully assessing
11  the implications of his actions. While these
12  situations are rare, this is an area that Ernie
13  can improve in. I would encourage him to slow
14  down when someone is 'pushing his buttons.' Were
15  it not for Ernie's outbursts and negative persona
16  around some supervisors, I would have rated him
17  exceptional in several areas."
18      Did I read that correctly?
19  A   Yes, sir.
20  Q   All right. And you agree with that
21  statement or you disagree with that statement?
22  A   I disagree with that statement. But in
23  summary, that is the statement that made clear to
24  me I could not trust Jeffrey Rogers. If you want
25  background how he came upon that statement, I'd be

Page 38

1  more than happy to provide it.
2  Q    Well, let me ask -- let me ask the
3  questions and maybe we can go about it that way.
4  A    Of course.
5  Q    Did you have outbursts when you were
6  working at the Lakewood Police Department?
7  A    I would voice my opinion, sir.
8  Q    And how would you voice your opinions?
9  A    I have a loud voice --
10 Q    Okay.
11 A    -- partially due to hearing loss from
12 field artillery. So at times, I probably don't
13 even recognize how loud I am. I would not use
14 profanity. But in one situation, there was safety
15 issues involved with the new radio system and a
16 shooting was being discussed -- an officer
17 involved shooting was being discussed. And in the
18 process of discussing this situation, it was
19 become known that the radio did not function. And
20 at that point, I said, "Captain, we can't depend
21 on the radios. They don't work."
22       That upset my lieutenant, and I was
23 placed on a 180-day "we're going to fire you"
24 probationary period. So in terms of outbursts, I
25 would say that that was probably an outburst;

Page 39

1  that, in hindsight, I probably just should have
2  sat there and not voiced my opinion about a
3  dangerous situation.
4  Q    Well, it appears to me just -- and I
5  wasn't there -- that your -- your supervisor had
6  concern about multiple incidents where you had
7  perhaps lost your temper or engaged in outbursts.
8  A    May --
9  Q    Is that fair?
10 A    May I address that?
11 Q    Sure. Absolutely, yeah.
12 A    Okay. My sergeant came to that
13 conclusion because in a public situation, not in a
14 private conversation, he had asked a animal
15 control officer, "What do you think of Ernie
16 Applegate?" That young lady's name was Holly.
17 And Holly said, "I think Ernie is wonderful.
18 He's" awful -- "always cheerful. He's" awful --
19 correction -- "always helpful. Yeah, I've got no
20 problems with Ernie."
21       Well, Sergeant Rogers' supervisor
22 overheard the conversation, and the person who
23 writes Sergeant Rogers' evaluation interrupted and
24 said, "Well, I think Ernie has a problem with
25 supervision." And that's where that all came

Page 40

1  from.
2  Q    So why would your supervisor's manager
3  believe that you have a problem with -- with
4  supervision --
5       MR. MCKENDREE: Objection, foundation,
6  competency.
7  Q    (By Mr. Barron) -- if you know? What
8  did you do to give him that opinion?
9       MR. MCKENDREE: Same objection.
10 Q    (By Mr. Barron) You can answer.
11      MR. MCKENDREE: Yes, you can answer.
12 A    I had a disagreement once with that
13 lieutenant.
14 Q    (By Mr. Barron) About what?
15 A    I will tell you. The nature of the
16 call was a landlord's threatened with a samurai
17 sword. The landlord was concerned about this
18 tenant, basically saying "He's whacky."
19 Q    Okay.
20 A    So when someone's whacky, you call
21 police. So I'm there. Other people are there.
22 We knock on the door. No answer. The landlord
23 gives his key. We make entry. We search. We
24 can't find him. The landlord says, "I know he's
25 in there." I part the clothes in the closet, see

Page 41

1  the top of a head, hand another officer my gun,
2  pull him out on the floor and handcuff him.
3       Was the samurai sword located? I don't
4  recall. I only know the landlord calls, "Hey, he
5  threatened me." Mentally ill guy's hiding in the
6  closet. Mentally ill guy's thrown on the bed.
7  Mentally ill guy is handcuffed. Mentally --
8  Mentally ill guy is taken to the holding area.
9       I fill out the arrest affidavit. The
10 arrest affidavit has to be approved by a sergeant
11 or a lieutenant. Lieutenant Lore was the one who
12 had to approve -- approve it, and he had problems
13 with my probable cause because we didn't find or
14 do an active search for the samurai sword.
15      So, basically, just a difference of
16 opinion. He felt I wasn't doing my job. I felt I
17 had done my job greatly. Crazy guy wasn't killed.
18 Police officers weren't hurt. Bad guy arrested.
19 Q    Did your lieutenant think perhaps you
20 were a little bit too aggressive --
21 A    I don't --
22 Q    -- in arresting this individual?
23      MR. MCKENDREE: Objection, foundation,
24 competency.
25 Q    (By Mr. Barron) Was that the basis for

### Page 42

1  this disagreement?
2  A   No, sir. That was not the basis for
3  the disagreement.
4  Q   Strictly over the lack of probable
5  cause?
6  A   He was concerned about probable cause.
7  Q   Did you ever have any verbal arguments
8  with this lieutenant?
9  A   I think he accused me in that same
10 time -- regarding that same warrant that I wasn't
11 doing my job.
12 Q   How did you respond?
13 A   I don't specifically recall. I mean, I
14 may have said, you know, "I did do my job," but it
15 was a perception of he would have did it
16 differently. Well, he wasn't there.
17 Q   I want to direct your attention to --
18 Again, it's Bates No. -1119, and this is your
19 rebuttal. If you look at -- about five paragraphs
20 down, there's a discussion about speaking with
21 Holly Gilbertson, animal control supervisor, and
22 then the opinion of a command level supervisor
23 carrying more weight.
24     Is that what we just talked about?
25 A   Yes, sir.

### Page 43

1  Q   What did your supervisor mean by
2  "encouraging you to slow down when someone's
3  'pushing your buttons'"?
4     MR. MCKENDREE: Same objection.
5  A   I don't know, sir.
6  Q   (By Mr. Barron) Did you have a
7  tendency to lose your temper when people were
8  pushing your buttons?
9  A   I don't believe so.
10 Q   Do you know -- Then why would he say
11 something like that about you.
12    MR. MCKENDREE: Same --
13 A   I have no idea.
14    MR. MCKENDREE: -- objection.
15    THE REPORTER: And when your counsel's
16 objecting, if you'll just wait to answer. Thank
17 you.
18    THE DEPONENT: Sorry.
19 Q   (By Mr. Barron) Shortly after
20 receiving this negative evaluation is when you
21 chose to retire, right?
22 A   Yes, sir.
23 Q   Okay. This was not the only negative
24 evaluation you received when you worked at the
25 Lakewood -- Lakewood Police Department.

### Page 44

1  Isn't that true?
2  A   I'd have to have more explanation as to
3  "negative." I mean, there were other out- --
4  evaluations I received. Evaluations evaluate your
5  whole year's activity.
6  Q   Okay. Fair enough. There were similar
7  criticisms throughout your career at Lakewood
8  about you having a temper and not following the
9  chain of command; things like that.
10    Isn't that true?
11 A   No, that's not true.
12 Q   Okay.
13    (Exhibit 3 marked.)
14 Q   (By Mr. Barron) Mr. Applegate, I've
15 handed you what's been marked as Exhibit 3 to your
16 deposition. And this is another performance
17 review, this one from 1999, evaluating the period
18 between '98 and '99.
19    Do you see that?
20 A   Yes, sir.
21 Q   Okay. All right. If you turn to
22 Page 3, it looks like, again, you received an
23 overall rating of successful.
24    Do you see that?
25 A   Yes, sir.

### Page 45

1  Q   And it talks about "The disruptive
2  behaviors displayed previously have been
3  absent" -- "have been absent." It talks about you
4  improving there.
5     What were the disruptive behaviors that
6  you had a problem with earlier?
7  A   Sir, amazingly, we have already
8  discussed it. It was the reason for the 180-day
9  re-evaluation. And that was, "Captain, we can't
10 depend on the radios. They don't work." That was
11 the reason for "If you don't change, we're going
12 to fire you."
13 Q   Where did you voice that concern about
14 the radio?
15 A   In a -- Unfortunately, in an open roll
16 call situation, because there was a debriefing
17 regarding an officer shooting where one of our
18 officers had to shoot a runaway.
19 Q   If you turn to Page -1217 -- again,
20 Bates numbers on the bottom right -- under the
21 "Examples and Narrative," it talks about "your
22 tendency to voice your personal concerns and
23 opinions in a public forum, with little regard for
24 time/place/manner considerations."
25    That's the incident you just discussed?

**Page 46**

1  A    That's what they're referring to, yes,
2  sir.
3  Q    Okay. And that's the -- that's the
4  only one that they're referring to, to your
5  knowledge?
6  A    Roll call situation, sir, is a time
7  where, on occasion, there is questions and
8  answers. There are other times when "We're
9  telling you something and we don't want to hear
10  anything."
11  Q    But you'd agree that, generally,
12  criticizing a supervisor or policies in the middle
13  of a public forum might not be the best place,
14  right?
15  A    I have to disagree with your statement.
16  I never criticized a supervisor in a public forum.
17  Q    Okay.
18  A    It never happened.
19  Q    You just criticized the -- the
20  performance of the radios?
21  A    I just raised an outburst of "We can't
22  depend on the radios. They don't work." As a
23  result of the radios not working, perhaps a
24  teenager got shot that didn't need to get shot.
25  Q    Who is Sergeant James Greer?

**Page 47**

1  A    Sergeant Greer was a patrol sergeant at
2  the time. He was my sergeant when I was
3  successfully completing this 180-day
4  re-evaluation.
5  Q    Who was Sergeant Paul Harold?
6  A    Sergeant Paul Harold was also a
7  supervisor who retired prior to my retirement.
8       (Exhibit 4 marked.)
9  Q    (By Mr. Barron) Mr. Applegate, I've
10  handed you what's been marked as Exhibit 4 to
11  your deposition. And this is an evaluation by
12  Sergeant Harold, whereas the last one we discussed
13  was an evaluation by Sergeant Greer.
14       Do you see that?
15  A    Yes.
16  Q    And Sergeant Harold rated you lower
17  than Sergeant Greer, correct?
18  A    Yes.
19  Q    He gave you an overall rating of needs
20  improvement, whereas Sergeant Greer gave you an
21  overall rating of successful, right?
22  A    Yes.
23  Q    If you turn to the third page of
24  Exhibit 4, it talks about the special review for
25  the next 180 days.

**Page 48**

1       MR. MCKENDREE: Is that -1233?
2       MR. BARRON: -1233, yes, sir.
3       MR. MCKENDREE: Thank you, sir.
4  A    I need to add -- I need to add a
5  clarification to something I previously said.
6  Q    (By Mr. Barron) Sure.
7  A    Sergeant Greer was my sergeant at the
8  end of the 180-day re-eval. Sergeant Harold was
9  the sergeant who had to substantiate a reason for
10  going on 180-day.
11  Q    Okay. So Sergeant Harold was the one
12  who suspended you?
13  A    No. Lieutenant Paletta is the one who
14  suspended me. But --
15  Q    So Sergeant Harold -- I'm sorry. Go
16  ahead.
17  A    -- Sergeant Paletta, under Lieutenant
18  Paletta -- Correction. Sergeant Harold, under
19  Lieutenant Paletta's evaluation process, was
20  basically instructed, "Ernie's going on a
21  180-day."
22  Q    Okay. All right. If you look on Bates
23  No. -1236, there's a whole paragraph there that
24  talks about -- I'm not going to read all of it --
25  but it characterizes "a vocal one-man battle

**Page 49**

1  against a department and what you perceive as its'
2  shortcomings"?
3       MR. MCKENDREE: Is that the paragraph
4  immediately after the bullet point paragraph?
5       MR. BARRON: Yes, sir.
6       MR. MCKENDREE: Thank you, sir.
7  Q    (By Mr. Barron) It begins, "The
8  negative side to your performance."
9       Do you see that?
10  A    "The negative side to your performance
11  in this element," is that the paragraph?
12  Q    That's the one.
13  A    Yeah.
14  Q    Yeah. I mean, it talks about multiple
15  issues there, not just the one.
16       Do you see that?
17  A    No, I don't. I -- I believe they're
18  all related to that same incident.
19  Q    Okay. I mean, for example, it talks
20  about, in January, Lieutenant Paletta logged that
21  you made a comment that was unacceptable.
22       That's, apparently, the one about the
23  radio, right?
24  A    Yes, sir.
25  Q    Okay. It says, "In September, Sergeant

**Page 50**

1  Cole logged that he wished he could have improved
2  your 'pained reaction to certain items on staff
3  notes or anything controversial' . . . I too,
4  observed these same reactions."
5       On -- October in roll call, you once
6  again voiced your concerns over the radio problems
7  and your perception that nothing's being done.
8       So it wasn't just one meeting.  This
9  was multiple times, right?
10  A   I just recall the one meeting, sir.  I
11 just recall the one meeting in terms of --
12 that rocked the boat was the outburst with too
13 many people in the room:  "Captain, we can't
14 depend on the radios.  They don't work."
15  Q   So you don't know why your -- your
16 supervisor would view that you had a, quote,
17 one-man battle against the department?
18  A   Probably because of that statement.
19  Q   And just that one statement alone?
20  A   I was probably more vocal in terms of
21 what needed to be fixed than other officers.  Was
22 that based on my experience?  Perhaps.
23 Disgruntled?  More concerned about safety, but it
24 was perceived that I was the problem, and they
25 solved the problem by shutting me up.

**Page 51**

1  Q   Okay.
2       MR. BARRON:  We've been going about an
3  hour.  We'll take a break.
4       THE VIDEOGRAPHER:  We're off the record
5  at 10:40.
6       (Recess from 10:40 a.m. to 11:52 a.m.)
7       THE VIDEOGRAPHER:  We're back on the
8  record at 10:52.
9   Q   (By Mr. Barron) Mr. Applegate, when
10 you worked for the Lakewood Police Department, you
11 were promoted to detective --
12  A   Yes, sir.
13  Q   -- at some point, right?
14  A   Yes, sir.
15  Q   That's a -- That's a pretty good
16 promotion from being a patrol officer to being a
17 detective, isn't it?
18  A   It's a step up.
19  Q   And yet you worked in that job for a
20 little while and then asked to be put back down to
21 the patrol division; isn't that right?
22  A   Yes, sir.
23  Q   Why?
24  A   My emphasis was on justice, and social
25 services had a completely different view.

**Page 52**

1   Q   What do you mean by that?
2   A   Well, I can provide an example.
3   Q   Sure.  Go ahead.
4   A   I investigated a sexual assault
5  involving a young man, age 15.  And the sexual
6  assault victim was a stepsister.  Because the
7  two -- I'm sorry.  It doesn't matter, stepsister
8  or whatnot.  Anyway, she was a high school
9  student.  They had consensual sex, and then there
10 was a point where she did not feel it was
11 consensual sex.
12      In the process of the interview, I
13 asked, "Well, how many times was it consensual and
14 how many times was it forced" of the victim.  And
15 social services informed me that I should not have
16 asked that question, wherein I thought my job was
17 to find the truth.
18  Q   So someone criticized you -- your
19 performance, and you didn't like, that so you
20 asked to step back down.
21      Is that basically what happened?
22  A   No, sir.
23      MR. McKENDREE:  Object to the form of
24 the question.
25  A   No, sir.

**Page 53**

1   Q   (By Mr. Barron) Well, the -- It was
2  criticism that you got about how you performed
3  your investigation on that particular occasion,
4  right?
5   A   It was an opinion -- It was one
6  opinion --
7   Q   Right.
8   A   -- of social services, who felt that I
9  was not enough of a hand-holder for the victims.
10  Q   They thought you were too aggressive?
11  A   No, sir.
12  Q   Well, what do you mean by "not" -- "not
13 enough of a hand-holder"?  What does that mean?
14  A   That I need to put the priorities of
15 the poor, distraught victim, who's now claiming
16 she's been sexually assaulted, above the same age
17 teenager, whose mother also loves him a great deal
18 and doesn't want to see him go to jail because now
19 his stepsister is claiming, "Oh, this time it was
20 rape."
21  Q   Okay.  That's a difficult thing to
22 manage, right?
23  A   Yes, sir.
24  Q   Reasonable minds can -- can differ as
25 to how to handle those types of situations, right?

Page 54

1  A    Law enforcement has one view.  Social
2  services has another at that -- at that juncture.
3  One example, sir.
4  Q    So there were other issues where you
5  didn't agree with how things were done?
6  A    Sir, when I left the department --
7  When I left crimes against children, the district
8  attorneys assigned to that section were
9  disappointed I was leaving because they felt I
10 cared about the kids.  Whereas, conversely, social
11 services was glad I was leaving, because they
12 didn't think I cared about the kids.
13 Q    Okay.  When you were working at --  Was
14 it Adams County Sheriff's Department?
15 A    Yes, sir.
16 Q    You worked there before Lakewood Police
17 Department, right?
18 A    5-1/2 years.
19 Q    Okay.  And you made it all the way to
20 sergeant; is that right?
21 A    Yes, sir.
22 Q    So the -- the chronology would be
23 patrol officer -- what? -- detective, then
24 sergeant?
25 A    Yes, sir.

Page 55

1  Q    So you made it all the way to sergeant
2  at Adams County Sheriff's Department --
3  A    Yes, sir.
4  Q    -- and then you took another job at
5  Lakewood going back all the way down to -- as a
6  patrol officer?
7  A    Yes, sir.
8  Q    Isn't that a step down?
9  A    It's a step down in terms of that
10 promotion ladder.  It was not a step down in pay.
11 I made more money making that transition than I
12 was as a sergeant for Adams County.
13 Q    So you made more money --
14 A    I qualified --
15 Q    Sorry.
16 A    -- for food -- free lunches when I
17 worked at Adams County.
18 Q    Okay.  So the reason for that move was
19 strictly pay?
20 A    And, as I stated earlier, I felt that
21 they could groom me for a managerial position.
22 Q    How many times were you suspended at
23 Lakewood?
24 A    I believe just once.
25 Q    And the once being for the outburst

Page 56

1  about the radio?
2  A    No.  The outburst was the 180-day
3  re-eval.  It wasn't actually a suspension.
4  Q    Okay.  Well, refresh my memory.  The
5  suspension would have been for what?
6  A    Another difference of opinion in how
7  police work is done.
8  Q    Okay.  Tell me about that one.
9  A    I arrive at a meth house.  I don't know
10 what the reason of the -- for the investigation
11 was, but in the process --  Oh, I'm sorry.  It was
12 a domestic verbal dispute, and the dispute was the
13 girlfriend had spent the money on drugs instead of
14 paying the rent.
15      And in the process of adjudicating the
16 verbal dispute between boyfriend/girlfriend, it
17 was learned that the female had a warrant for her
18 arrest.  So she was going to jail sooner or later.
19 And it appeared, in the opinion of the assisting
20 officer, that it was going to be much later,
21 because she continued not to act --  When the lady
22 is saying, "I'll take care of it," no.  "I was on
23 my way to pay the bondsman," et cetera, et cetera,
24 et cetera.
25      And I interrupted and took control of

Page 57

1  the arrest, arrested her, put her in the car, took
2  her to jail.  And the other officer felt that that
3  was not right.
4  Q    Okay.  And you were written up and
5  suspended for that?
6  A    I believe so.
7       (Exhibit 5 marked.)
8       MR. MCKENDREE:  5?
9       THE REPORTER:  Yes.
10      MR. MCKENDREE:  Thank you.
11 Q    (By Mr. Barron)  Mr. Applegate, you've
12 been handed what's been marked as Exhibit 5 to
13 your deposition.  And I'll represent to you that
14 this is the notice of suspension from your
15 personnel file as a Lakewood Police Department
16 about this incident.
17      Do you see that?
18 A    Yes.
19 Q    And in here it talks about something
20 else that you didn't mention in your deposition
21 today, that when taken into custody, the female
22 said, "Don't touch me," and your response was to
23 touch her four times on her back while stating
24 "I'm touching you here.  I'm touching you here."
25 And part of the criticism was that you were -- you

**ERNEST APPLEGATE**

Page 58

1 were acting childish and further antagonizing the
2 arrestee for no useful purpose.
3     Did that happen?
4   A   Yes, sir.  It did.
5   Q   Okay.  Would you agree that that's
6 childish and inappropriate for a police officer to
7 do that?
8   A   Yes.  I should not have done it.
9   Q   Part of the criticism was that you were
10 not doing anything to calm her, but instead,
11 getting angry with her.
12     MR. MCKENDREE:  Objection, form of the
13 question.
14   Q   (By Mr. Barron)  Is that fair?
15     MR. MCKENDREE:  Same objection.
16   A   No, sir.  It's not fair.
17   Q   (By Mr. Barron)  Okay.  Do you have an
18 anger control problem, sir?
19   A   No, sir.
20   Q   Have you ever been told that by
21 anybody?
22   A   I can't recall.
23   Q   You've never been told you have a
24 temper?
25   A   I can't recall.

Page 59

1   Q   Who -- Who reported you, again, on
2 this incident?
3   A   On this incident, it would have been
4 Patrol Agent Amanda Jackson.
5   Q   Did y'all have a history of fighting or
6 problems before that?
7   A   No, sir.
8   Q   So that would be a pretty big deal,
9 when one officer reports another police officer
10 about how they handled -- I don't know what you
11 call it -- a collar or whatever you want to call
12 it, but -- I mean, that doesn't happen very
13 often, does it?
14   A   Well, sir, I wouldn't have done it to
15 her, but she decided to do it to me.
16   Q   She felt so strongly about this that
17 she reported a fellow police officer, right?
18   A   Yes, sir.
19   Q   Did you ever talk with her about why
20 she did that?
21   A   No, sir.
22   Q   Were you also in the Colorado National
23 Guard?  That's what you meant when you said
24 "National Guard"?
25   A   Yeah.

Page 60

1   Q   Okay.
2   A   Yes, sir.
3   Q   So it was the Army, and then
4 Colorado -- U.S. Army and Colorado National Guard?
5   A   Active service was United States Army.
6 Reserve duty was with Colorado Army National
7 Guard.
8   Q   Did you ever see any discipline in
9 either the Colorado National Guard or the U.S.
10 Army?
11   A   I don't believe so.
12   Q   No military discipline, court martial;
13 anything like that?
14   A   No, sir.
15   Q   Okay.  Honorable discharge from the
16 U.S. Army, I assume?
17   A   Yes, sir.
18   Q   Have you ever been terminated from a
19 job that we haven't already talked about?  Because
20 I notice there's some other jobs here -- here and
21 there that I don't think were all that relevant,
22 but I just want to know if you've ever been
23 terminated?
24   A   No, sir.
25   Q   So, for example, it looked like you

Page 61

1 worked at a film lab?
2   A   Rocky Mountain Film Lab, yes, sir.
3   Q   Yeah.  You left there voluntarily?
4   A   It was a dead-end job, sir.  Yes, I
5 left there voluntarily.
6   Q   Same thing with the press company?
7   A   Yes, sir.
8   Q   You left voluntarily?
9   A   Yes, sir.  I started with the
10 Adams County Sheriff's Department from there.
11   Q   I believe that brings us up to Heath.
12 Does that sound about right?
13   A   It's up to you, sir.
14   Q   Well, any other jobs in there that I
15 missed?  I'm just going off your applications.
16   A   No.
17   Q   Okay.  All right.  How did you find out
18 about an opening with Heath?
19   A   A friend of mine from church.
20   Q   Who was that?
21   A   Scott Gay, G-a-y.  Or is it G-a-y-e?
22 G-a-y.  Scott Gay, S-c-o-t-t G-a-y.
23   Q   Did he work at Heath?
24   A   Yes, sir.
25   Q   And was he a field technician or some

16 (Pages 58 to 61)

**Page 126**

1 Q You were angry?
2 A I was upset, sir.
3 Q Is there some difference in your mind
4 between "upset" and "angry"?
5 A Yes.
6 Q What's the difference?
7 A That's tough to define. I don't know.
8 Q You were emotional, right?
9 A I will -- Yes. I've been married
10 41 years. That's a lovely woman. She's not
11 feeling well.
12 Q So you --
13 A Her health is not the best.
14 Q So you went in --
15 A I will defend her, sir.
16 Q Absolutely. You went in and you
17 defended your wife, and you gave her supervisor a
18 piece of your mind about the way you believed he
19 was unfairly treating employees generally,
20 correct?
21     MR. MCKENDREE: Object to the form of
22 the question.
23 A Yeah.
24 Q (By Mr. Barron) And you did that loud
25 enough for everybody to hear?

**Page 127**

1 A I can't state that, sir.
2 Q Well, if other employees testify that
3 they heard it, you're -- you're not saying they're
4 liars, right?
5 A Oh, I'm -- I'm not saying that, sir.
6 Q Right.
7 A But I don't know how far my voice or
8 volume carried.
9 Q Sure.
10 A I don't know what other background
11 noise was occurring.
12 Q Okay.
13 A Did others hear it? Yes, sir. I'm
14 sure others did.
15 Q And that office is a pretty small
16 office, right?
17 A Real small.
18 Q Yeah. There's not a lot of privacy
19 there, right?
20 A Nope.
21 Q And -- And you -- you were -- you were
22 in an open area. You didn't -- You weren't
23 behind closed doors, were you?
24 A I was standing outside the business,
25 sir --

**Page 128**

1 Q Right.
2 A -- with the door partially open.
3 Q So everything you said could carry into
4 the office, correct?
5 A Keith was inside the office.
6 Q And you were yelling at him from
7 outside and he was inside?
8 A Yes, sir.
9 Q Did you ever ask him to step out --
10 A First of all, I was not yelling. I was
11 speaking to him --
12 Q Louder than --
13 A -- in a loud voice.
14 Q So that he could hear you being inside
15 when you were outside?
16 A So that he could hear me where the
17 gentleman with the microphones is. I mean, at the
18 end of the table or shortly this side of the
19 table.
20     MR. MCKENDREE: You're referring to the
21 video- -- videographer?
22     THE DEPONENT: Yes.
23 Q (By Mr. Barron) Isn't it true that you
24 asked Mr. Monnig to step outside?
25 A It may be, sir.

**Page 129**

1 Q Yeah. With the implication being to
2 kick his ass or --
3 A No, sir.
4 Q -- take some sort of action?
5 A No, sir. Not at all. That is a lie.
6 Q Okay.
7 A That is not the intent and it is not
8 correct.
9 Q Well, can you -- Do you recall exactly
10 what you said when you asked him to step outside?
11 A No.
12 Q You can understand how, when a man is
13 upset, being loud, talking to another man and
14 asking him to step outside, how that might be
15 construed as --
16 A No.
17 Q -- a threat of violence?
18 A No, sir. I -- I cannot --
19 Q You don't understand how --
20 A No.
21 Q -- that might be --
22 A No, sir. I cannot make that leap. I
23 can't do it.
24 Q Okay. Being a police officer -- In
25 all your years as a police officer, you've never

Page 130

1  heard that expression, someone to another man,
2  "Let's step outside"?  Have you heard that before?
3      A    No, sir.  I haven't.
4      Q    You've never heard of two -- two men or
5  women being in an altercation and one asking the
6  other to step outside?
7      A    I personally have not heard that.
8      Q    Okay.  Is there anything else that
9  happened on Wednesday that you can recall sitting
10 here today?  We're talking about the Wednesday
11 before Thanksgiving.
12         MR. MCKENDREE:  I assume you mean after
13 responding to the request of his wife?
14         MR. BARRON:  Yeah.
15         MR. MCKENDREE:  Right.
16     Q    (By Mr. Barron)  I mean, we've talked
17 about the conversation with Keith.  Did you just
18 drive off or was there anything else that you can
19 remember?
20     A    I believe we just got in the car and
21 left.  I -- I believe that was the end of it,
22 when I was on the other side of the door.  I went
23 in the car -- got in the car and left.
24     Q    Okay.
25     A    I don't recall anything further

Page 131

1  happening.
2      Q    And you don't --  There was no
3  discussion on Thursday, Friday, Saturday, Sunday
4  with Keith, right?
5      A    Not that I recall.
6      Q    Let's talk about Monday morning --
7      A    Sure.
8      Q    -- which I believe was December 2nd
9  when you came back to work.  What happened?
10     A    We drove down together in the company
11 vehicle.  We arrived for work.  As we walked into
12 the office, we're advised that we're both
13 suspended for the day.
14     Q    Okay.  Who told you that?
15     A    Mr. Monnig.
16     Q    And do you remember his exact words,
17 the best you can?
18     A    No, not his exact words.
19     Q    Okay.  Where did he tell you that?
20     A    It wasn't in a private conversation.
21 It was, I think, just inside the garage area, as I
22 recall.
23     Q    All right.  And then what did you say
24 or what did --
25     A    I said -- I think I asked, "Paid or

Page 132

1  unpaid?"
2      Q    Okay.
3      A    And I can't recall what his response
4  was.
5      Q    And then what happened?
6      A    I asked, "Well, how long?"  And he said
7  he'd give me a call.  Wait a minute.  Okay.  Okay.
8          I think -- After the "Paid or unpaid,"
9  I think as I'm walking around the desk -- I'm
10 coming around a desk, I come around him and I say,
11 "We're not going down without a fight."
12     Q    Okay.
13     A    And then do you know what happened?  Do
14 you want to know what happened after that?
15     Q    I absolutely want to know what happened
16 next.
17     A    He whirls (indicating) around and goes,
18 "Did you hear that?  Did you hear that?"
19         And I leaned back in, "I said, we're
20 not going down without a fight.  I haven't learned
21 to grovel well," and I left.
22     Q    Okay.  Do you recall anything else?
23     A    No, I don't.
24     Q    Okay.  Is it fair to say you were angry
25 on Monday when you came in?

Page 133

1      A    I'm getting suspended for no logical
2  reason.
3      Q    Sure.  You're upset, right?
4      A    Of course.
5      Q    You were --
6      A    I just drove 40 miles.  We walk in the
7  door, "You can go home now."  Come on.
8      Q    It was a paid suspension, correct?
9      A    I believe it was.  I didn't know it at
10 the time --
11     Q    Yeah.
12     A    -- but I believe it was.
13     Q    If -- If Heath had already made its
14 mind to fire you, they would have just told you
15 right then that you were fired -- right? --
16 presumably.
17         MR. MCKENDREE:  Objection --
18     A    Sir, I don't --
19         MR. MCKENDREE:  -- competence.
20     A    -- know.
21     Q    (By Mr. Barron)  Yeah.  But they didn't
22 tell you you were fired.  They told you you were
23 suspended?
24     A    Sir, all I know is the same day, Mary
25 Strawn is hearing we were fired.

### Page 134

1  Q   Yeah.
2  A   So when did they -- When did they
3  decide I was fired? The weekend before? I don't
4  know.
5  Q   Yeah. I mean, they might have
6  decided --
7  A   I just know that other people in that
8  office had been advised, "Well, Ernie and Retha
9  aren't going to be here anymore" before we were
10 even notified "You're terminated."
11 Q   Were you being loud on Monday?
12 A   I just demonstrated how loud I was.
13 Q   And you think that's the same tone that
14 you used on the Monday when you're talking with
15 Mr. Monnig?
16 A   No. I'm sorry. I'm confused. The
17 Monday --
18 Q   Yeah.
19 A   -- when I turned and said, "I said
20 we're not going down with (sic) a fight" was
21 louder than when I was standing outside the door,
22 "You don't care about your people. You are
23 chasing them off. You have no idea how hard she
24 works for you."
25 Q   Why did you say that you're not going

### Page 135

1  down without a fight? Why would you say something
2  like that?
3  A   Because I felt we were unjustly being
4  fired. We were being terminated. And I'm not
5  going to go meekly. If you've got just cause to
6  terminate me, fine.
7  Q   Uh-huh. Did you feel like --
8  A   And my wife -- Why is he terminating
9  my wife? Two weeks earlier -- Two weeks earlier,
10 we both had successful yearly evaluations. Two
11 weeks later (indicating), you're out of here.
12 Q   Uh-huh. By -- By this point, had your
13 wife told you that -- that she was accused of
14 yelling at Jason Camper the week before?
15 A   Sir, I don't know if we had that
16 conversation over the Thanksgiving weekend or not.
17 We may have had that conversation. I can't
18 recall.
19 Q   She didn't tell you that that was one
20 of the reasons why management was upset with her,
21 that she was yelling at Jason Camper?
22 A   She never told me she was yelling at
23 Jason Camper. She said, as I recall it, over the
24 Thanksgiving weekend, she felt that Jason was
25 badgering her, would not leave her alone while she

### Page 136

1  was trying to do her job and that she said, "Stop.
2  Leave me alone."
3  Q   Do you think it's acceptable for an
4  employee to tell a supervisor, "Stop. Leave me
5  alone"
6  Mr. MCKENDREE: Objection --
7  A   He was.
8  MR. MCKENDREE: -- competence.
9  A   -- not her supervisor, sir. He was not
10 her supervisor.
11 Q   (By Mr. Barron) Okay.
12 A   You -- You can -- No, sir. He wasn't
13 her supervisor.
14 Q   Well, she -- He was a supervisor?
15 A   He was not her supervisor.
16 Q   Well, who was her supervisor?
17 A   Keith Monnig, and that was the direct
18 chain of command. Keith, in fact, has told my
19 wife --
20 Q   Yeah.
21 A   -- "I'm your manager. You listen to
22 me."
23 Q   But a crew leader would be a -- in a
24 supervisory position in the same office where she
25 worked, correct?

### Page 137

1  A   I will not accept that, sir. I will
2  not.
3  Q   Well, I'm not asking you to accept it.
4  I mean --
5  A   Well, no. I -- I will not agree with
6  what you're saying. I'll not say correct.
7  Q   Okay.
8  A   Jason was not her supervisor.
9  Q   Well, if Heath says that -- that she
10 needed to take instruction from him because he was
11 a supervisor, who are you to say Heath can't have
12 that rule? It's not up to you, is it?
13 A   It's up to Keith, the manager.
14 Q   Well, I guess it's ultimately up to
15 Heath. But if Keith Monnig says that "No, I -- I
16 expected her to take instruction from crew
17 leaders," would you disagree with that?
18 A   That would be up to Keith.
19 Q   Right.
20 A   I wouldn't disagree with that.
21 Q   Fair enough.
22 A   That's up to Keith.
23 Q   Okay.
24 A   But all's I know is, according to what
25 my wife -- wife tells me, her direct chain of

**Page 146**

1  Q   Okay.
2  A   -- so . . .
3  Q   I mean, they could have just said,
4  "Call a family member or get a cab," but they
5  didn't do that.  They offered to take you home,
6  right?
7  A   Oh, so your opinion is -- is that they
8  did -- they were real nice in letting --
9  Q   My opinion, frankly, doesn't matter.
10 A   You're exactly -- I understand.  I
11 understand.
12 Q   I'm -- I'm -- I'm a lawyer, so . . .
13 A   Okay.
14 Q   But I'm just --
15     Mr. MCKENDREE:  Remember my admonition.
16 You answer the questions.
17     THE DEPONENT:  I got it.
18     MR. MCKENDREE:  You don't ask them.
19     THE DEPONENT:  All right.  Thank you,
20 sir.  Okay.
21     MR. MCKENDREE:  Or you get in trouble
22 with me, and then you'll find out what yelling is
23 really all about.
24     THE DEPONENT:  Okay.
25 Q   (By Mr. Barron)  So you were told you

**Page 147**

1  were fired.  You had a discussion about how to get
2  home.  They offered to have Luke drive you home.
3      Was there any other discussion?
4  A   Not at that time.  I believed that --
5  You know, I believed I had made the decision I'd
6  call my son to come get us.  I'm then outside with
7  Ron Warren and -- unloading the vehicle, and I
8  remember telling Ron Warren, "Ron, this ain't
9  right."
10     (Mr. Gallego entered the room.)
11     And Ron goes, "It could have been
12 handled differently."
13     And I said, "That goes both ways."
14 And then my next thought was, "I'm calling HR."
15 So I leave Ron and the task of emptying out the
16 vehicle, and I walk inside the office to ask Retha
17 or someone for the number to HR, because I'm going
18 to call HR to see if they're aware that Retha and
19 I have been terminated.
20     And in the process of asking for HR's
21 phone number, Mr. Monnig says, "You're not calling
22 HR."
23     "What?"
24     "You're not calling HR."
25     "I am, too."  He doesn't give me the

**Page 148**

1  number.  Retha hollers it out.  It's a 1-800
2  number.  I punch it in.
3      Monnig says, "You're not calling from
4  the office."  I ignore him.  Or --  Or he says --
5  I think he says in there, "You're not using the
6  phone."
7      "I'm using my phone."
8      "You're not calling from the office."
9      And I ignored him and continued --
10 continued calling.  And she said, "I'll call the
11 cops."
12     And I said, "Go ahead and call the
13 cops.  I've been a police officer for 25 years.  I
14 know how these employer/employee situations work.
15 So go ahead."
16     He turns to Jason, who's in the office,
17 and Jason dutifully calls.  And I finally get
18 ahold of somebody from HR.  I'm talking to Becky
19 Jimenez on the phone.  My wife comes out and says,
20 "You need to talk outside," so I continue the
21 conversation walking outside.  I've got Becky
22 Jimenez on the phone.  I'm asking her, you know,
23 "What's going on?  We just got terminated" and
24 trying to explain what happened to her.
25     And then I -- Then Retha comes out,

**Page 149**

1  and I say, "Here, it's probably best if you hear
2  it from the person who knows what happened," and
3  handed the phone to Retha.  Retha's not -- now got
4  my phone and she's talking to Becky Jimenez.  And
5  Retha has walked back away from me a little bit,
6  and then two police officers exit the rear of the
7  building.  One goes to my wife and the other one
8  immediately comes to me and says, "Sir, take your
9  hands out of your pockets."
10 Q   Okay.  Let me stop you there.
11 A   Sure.
12 Q   So the issue with Mr. Monnig was they
13 wanted you out of the office, and you wanted to be
14 in the office when you made the call to HR,
15 correct?
16 A   It's immaterial.
17 Q   Well --
18 A   Well, wait --
19 Q   -- it's --
20 A   -- a minute.
21 Q   -- my question, so I need you --
22 A   Okay.
23 Q   -- to answer my question.
24 A   It's your -- It's your -- It's your
25 question.  I'm sorry.  So what's your question?

ERNEST APPLEGATE

**Page 150**

1  Q   Sure. My question was the dispute over
2  calling HR was because they wanted you out of the
3  office and you wanted to stay in the office to
4  call HR?
5       MR. MCKENDREE: Objection, competence.
6  A   I -- I don't know how to answer that.
7  It didn't matter to me whether I talked inside the
8  office or outside the office.
9  Q   (By Mr. Barron) Well, it mattered to
10 them, because they wanted you to leave.
11 A   Well, I guess so.
12 Q   Right. I mean, they told you, "We want
13 you the leave" --
14 A   Yeah.
15 Q   -- and you -- you wanted to -- "No.
16 I'm going to stay here. I'm going to call HR,"
17 and you're making a big production out of it,
18 right?
19 A   All right. So how long do you think I
20 stayed there before I left?
21 Q   I have no idea, sir. I wasn't there.
22 A   Probably 30 seconds, sir.
23 Q   Okay.
24 A   Maybe a minute.
25 Q   But the issue was they wanted you to

**Page 151**

1  leave and you were refusing to leave, right?
2  A   I left shortly after, "Call the
3  police." So I walked out, still on the phone
4  after I had made contact.
5  Q   Okay.
6  A   I did not purposely stay in the
7  office -- in the office to make the phone call.
8  Now, bear in mind, my wife is still inside.
9  Q   Well, they asked both of you to leave,
10 didn't they?
11 A   No. They asked me to leave the office.
12 Q   Did they ever ask you to sign
13 something?
14 A   No, sir. They never did.
15 Q   How about your wife?
16 A   You'll have to ask her, sir.
17 Q   Okay.
18      MR. BARRON: All right. Let's take a
19 break, and then we'll go through the police
20 report.
21      Okay.
22      THE VIDEOGRAPHER: We're off the record
23 at 2:00 p.m.
24      (Recess from 2:00 p.m. to 2:10 p.m.)
25      (Exhibit 10 marked.)

**Page 152**

1       THE VIDEOGRAPHER: We're back on the
2  record at 2:10.
3       (Exhibit 10 marked.)
4       MR. MCKENDREE: Is this 10?
5       MR. BARRON: Yes.
6  Q   (By Mr. Barron) Mr. Applegate, we're
7  back on the record.
8       Do you understand that?
9  A   Yes, sir.
10 Q   Where we left off, we were talking
11 about the police coming out to Heath's property on
12 the date that you were terminated.
13      Do you recall that?
14 A   Yes, sir.
15 Q   And I've handed you what's been marked
16 as Exhibit 10 to your deposition. And I'll
17 represent to you that this is a -- a police report
18 from one of the police officers who handled that
19 call.
20      Do you see that?
21 A   Yes, sir.
22 Q   And you -- you were a police officer
23 before, so you've had to prepare incident
24 reports --
25 A   Yeah.

**Page 153**

1  Q   -- like this in the past, haven't you?
2  A   This is a report that I requested
3  Mr. Guida to write.
4  Q   Okay. Is it common for police officers
5  to write reports when they're called out to a
6  scene for -- for something?
7  A   When they're requested, especially. If
8  it's just an incident report, "I came. I saw.
9  I'm out of here," no report's necessary.
10 Q   Just so I'm clear, though, are you
11 saying that -- that this officer wrote this
12 incident report because you asked him to or was
13 this, in your experience, just part of his job to
14 do this?
15 A   I requested him to write a report, sir.
16 I believe he was going to write a report at my
17 request. Did he include the specific thing I
18 wanted? No, he did not.
19 Q   What was the specific thing you wanted
20 him to include?
21 A   I wanted him to include Mr. Monnig's
22 keeping my wife in the office against her will.
23 Whenever --
24 Q   What do you recall about --
25 A   -- he would --

**Page 174**

1  her?  Did you draft --
2   A   Oh.
3   Q   -- correspondence or anything?
4   A   In terms of drafting, I can't recall.
5   Q   Okay.
6   A   We -- We -- I need more definition as
7  to what you mean "in drafting a response."
8   Q   I'm just asking what you did, I mean,
9  if you did anything.  Did she handle that or did
10 you handle that or did you both --
11  A   We both did that.
12  Q   Okay.  At any point before your
13 termination in December of 2013, did you make a
14 complaint about discrimination to Heath?
15  A   We were terminated on the 3rd, not the
16 13th.
17  Q   I'm sorry.  The 3rd, yeah.
18  A   No, I did not.
19  Q   Okay.  Did you make any complaints of
20 discrimination, sexual harassment, anything like
21 that before your termination from Heath?
22  A   No, sir.
23      MR. MCKENDREE:  To -- To Heath or
24 anybody?
25      MR. BARRON:  To Heath, yeah.

**Page 175**

1       MR. MCKENDREE:  Thank you.
2   Q   (By Mr. Barron)  To Heath.
3   A   No, sir.
4   Q   Okay.  Just to close that out, in your
5  conversations with Mr. Gallego and anybody in HR,
6  including Becky Jimenez after you were terminated,
7  did you personally raise any allegations of
8  discrimination or harassment?
9   A   I do not recall doing so.
10  Q   Okay.  Do you know who made the
11 decision to -- to terminate your employment?
12  A   No, sir.  I do not.
13  Q   Has anybody at Heath ever made a
14 comment to you that you felt was inappropriate or
15 discriminatory based on your age?
16  A   Specific comments, no.  Actions, yes.
17  Q   Okay.  What actions are you talking
18 about?
19  A   Our company car immediately went to
20 Jason Camper.
21  Q   The one that you were driving before
22 you were terminated?
23  A   (Deponent nodded head.)
24  Q   And why do you think that's
25 inappropriate?

**Page 176**

1   A   Because it was inappropriate that we
2  got fired.
3   Q   Okay.
4   A   And the same person that was part of
5  the firing process; i.e., badgering my wife, is
6  the same person that benefits from her firing.
7   Q   Not everyone that worked at Heath had a
8  company vehicle; isn't that true?
9   A   That is very true, sir.
10  Q   In fact, there were in sort of tight
11 supply, right?
12  A   They were a definite benefit.
13  Q   And you and your wife received that
14 benefit even though many others did not have one,
15 right?
16  A   Yes, sir.
17  Q   Do you know why you had a company
18 vehicle and others didn't?
19  A   Because there were two of us that
20 worked there, I would assume.
21  Q   I mean, did you ever have a discussion
22 with anybody in management about why you had a
23 vehicle?  Did they tell you, "We're giving you it"
24 for this reason; anything like that?
25  A   Never.

**Page 177**

1   Q   Did you ask for a car?
2   A   I don't recall.
3   Q   So did -- I'm just curious how that
4  happened.  Did they just come to you one day and
5  say, "Would you like a company vehicle" or did you
6  say, "You know" --
7   A   I --
8   Q   -- it would be --
9   A   I think --
10  Q   -- good to have one?
11  A   I think the company vehicle became
12 available or is a potential benefit for inside
13 meter readers.  So when I got the Public Service
14 clearance to be an inside meter reader, I believe
15 I got the ability to receive that benefit, and
16 Mr. Monnig, because both of us worked there,
17 graciously provided it.
18  Q   Okay.  And you kept that vehicle even
19 when you no longer were doing that particular job,
20 right?
21  A   No.
22  Q   Well, you said inside meter reading
23 was -- I think later on in your career you were a
24 leak survey technician?
25  A   No.  No.