```
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO


Civil Action No. 16-CV-00648-RPM
_____

VIDEO DEPOSITION OF RETHA APPLEGATE
September 20, 2016
_____

RETHA APPLEGATE and ERNEST APPLEGATE,
Plaintiffs,
vs.
HEATH CONSULTANTS, INC.,
Defendant.
_____


APPEARANCES:
     LAW OFFICE OF JOHN MCKENDREE
          By John McKendree, Esq.
             44 Cook Street, Suite 100
             Denver, Colorado  80206
                Appearing on behalf of Plaintiffs
     COZEN O'CONNOR
          By David L. Barron, Esq.
             1221 McKinney Street, Suite 2900
             Houston, Texas  77010
                Appearing on behalf of Defendant
Also Present: Monika Cary, videographer
              Ernest Applegate
              Shanna Waterson
              Mary Oliveros
              Isaid Gallego
```

### Page 14

1  Q   Okay. Before that . . .
2  A   Before that, I was probably in high
3  school.
4  Q   Okay. You mentioned the Civil --
5  the --
6  A   Civil Air Patrol.
7  Q   Civil -- Yeah.
8  A   That was during my time at Platte
9  Canyon High School.
10 Q   So you were doing both?
11 A   Yes.
12 Q   Okay.
13 A   It was a volunteer position.
14 Q   At the Civil Air Patrol?
15 A   Uh-huh.
16 Q   Okay. How much time was that? Was
17 that, like, a certain schedule that you had where
18 you put in, like, two weeks in the summer or
19 something, or how -- how did that work?
20 A   No. It was weekly meetings with the
21 cadets in the high school.
22 Q   Oh, okay. So was that sort of like an
23 ROTC thing, or -- I -- I just don't understand.
24 I just want to make sure I --
25 A   It's an Air Force auxiliary, yes.

### Page 15

1  Q   Okay. So it's the Air Force version of
2  that?
3  A   Basically, yes.
4  Q   Okay.
5  A   It's to get the students involved in
6  that and give them an idea of what it's like.
7  Yes, they did one -- like a one-week boot camp --
8  Q   Uh-huh.
9  A   -- that was at the Air Force Academy in
10 Colorado Springs.
11 Q   Okay. Thank you. In your -- your
12 positions at the -- at Empire and Fidelity, did
13 you leave those jobs voluntarily or were you
14 terminated?
15 A   Yes, I did.
16 Q   You left --
17 A   Left them voluntarily.
18 Q   Okay. And then Platte, you resigned,
19 correct?
20 A   Yes, I did.
21 Q   Okay. Have we covered all the jobs
22 that you've held that you can recall?
23 A   I believe so. At Empire Savings &
24 Loan, they were grooming me to be a manager.
25 However, I had a two-year-old and a newborn. I

### Page 16

1  made the decision that I would stay home, raise my
2  two children rather than spend 50 to 60 hours a
3  week as a manager.
4  Q   Okay.
5  A   I don't regret that.
6  Q   Let's talk about Platte. My
7  understanding is that there was a -- an incident
8  that happened at Platte while you were there?
9  A   There was a shooting.
10 Q   Okay. Do you remember when that was?
11 A   Yes, I do. September 27, 2006. The
12 anniversary's coming up in a few days.
13 Q   Tell me what happened.
14 A   What happened? A gunman came into the
15 building, took over a classroom. He shot through
16 the wall. A call was sent out to the entire
17 building saying "Code White." Immediately,
18 shutdown procedures were ensued. However, as a
19 paraprofessional, the -- I had not been given a
20 key in order to lock down my room, so I took my
21 children, the special ed kids I had in my room at
22 that time, a teacher -- a speech teacher who just
23 happened to step into the area, I took them both
24 into the library, and that's where we stayed until
25 we were -- until we came out.

### Page 17

1  Q   Did you ever see the shooter?
2  A   No, I did not.
3  Q   Okay. How long were you in the
4  library?
5  A   About 6-1/2 hours.
6  Q   What time of day did this happen?
7  A   11:40 in the morning. Just before
8  lunch.
9  Q   And so you got out about what time?
10 About 5:00 --
11 A   It was around --
12 Q   -- 6:00?
13 A   -- that time. I did not make it home
14 until 7 o'clock. I was -- My husband did not
15 know if I stayed alive for eight hours.
16     They had gone through the building with
17 the SWAT teams. They had used dogs for bombs.
18 They had stated that the place was fully
19 evacuated, yet they couldn't find us.
20 Q   Okay. So they didn't know you were in
21 the library?
22 A   Later, they stated they did know, but
23 no one came.
24 Q   So just so I'm clear, are -- are you --
25 do you believe that they -- the police

Page 18

1 purposefully left you in the library, or do you
2 believe that --
3     A    I do not.
4     Q    Okay.  So you believe it was an
5 oversight or something, right?
6     A    Protocol stated that we were to stay in
7 our position until administrative staff or --
8 and -- who would come with the SWAT member of
9 course --
10    Q    Right.
11    A    -- would come and release us.
12    Q    Do you --
13    A    However --
14    Q    Go ahead.
15    A    -- being in the library --  The shooter
16 took a side window on the upper -- upper level.
17 He could see the entire second floor.  He could
18 see the atrium below, similar to what happened at
19 Columbine.  So all of the activity was in the
20 library, trying to get up into that area to subdue
21 the man.
22    Q    So -- So where you were at, there were
23 police officers in there?
24    A    They were all around us.  They did not
25 know we were there.  They did not search the

Page 19

1 entire library before they took on other
2 situations.  The sniper told me, he said, "I saw
3 the librarian early on."  Within --  Because of
4 the melee and all of the --  Because of the
5 situation, it had been forgotten.
6     Q    What happened to the shooter?  Did
7 they --  Did they shoot him or did they --
8     A    He shot himself.
9     Q    He shot himself?
10    A    He's a coward.
11    Q    You didn't see any of that, though,
12 right?
13    A    No, I did not.
14    Q    All right.  How many children did you
15 have with you?
16    A    I had three special ed, plus a young
17 girl, 16 years old.  She took calculus.  She was
18 allowed to go in the library and help the
19 librarian.  She was finished with her work, so
20 there were four children total.
21    Q    And any other adults?
22    A    Two women.
23    Q    Okay.  You and the speech teacher?
24    A    Myself, the speech teacher and the
25 librarian.  There were two other adults.

Page 20

1     Q    What --  Where were y'all in the
2 library?  Were you, like, in a -- in a room, like
3 a -- like a closed door area or were you out in
4 the -- where the books were?
5     A    The designated room that we were
6 supposed to be in was a conference room like this.
7 We would be able to close the drapes -- the drapes
8 or the blinds so that no one, you know, could look
9 across the room and know that people were in there
10 and become hostages themselves.  However, no one
11 put a lock on that door, so we looked for the
12 second best place in the area, and that was a
13 small work room.  And I would say it's probably
14 half the size of this room.
15    Q    Okay.
16    A    We shut the lights off.  We put posters
17 on the windows within 6 inches to the top.
18    Q    So you --
19    A    We did not want to be taken hostage as
20 well.
21    Q    Okay.
22    A    At that time, we -- we did not know how
23 many there were.  We didn't know where they were.
24 We didn't know the access they had.  They could
25 have come down back stairs.

Page 21

1     Q    Did you have cell phones at that time?
2     A    Cell phones are not allowed in the high
3 school.
4     Q    Okay.  Okay.  I guess times have
5 changed.
6     A    Well, even if they had, it wouldn't
7 have mattered --
8     Q    Yeah.
9     A    -- because Platte Canyon High School
10 sits here (indicating), and there is a sheer
11 rock -- granite mountain right behind it.  It is
12 made out of cement blocks.  The police even had
13 trouble with their own --
14    Q    Radios?
15    A    -- yes, with their own radios in order
16 to communicate with each other.
17    Q    Okay.
18    A    So it wouldn't have mattered if we did
19 or not.
20    Q    Now, my understanding is that you
21 filed, at the time and maybe even subsequently, a
22 workers' comp claim arising out of that stressful
23 situation, right?
24    A    We, as an entire staff, were told that
25 anyone was -- anyone was to be given counseling.

Page 22

1  And there were several different options in order
2  to do that. You could go through workers' comp.
3  You could -- They had private people in the area,
4  and so these were taken care of and they were paid
5  for by the district, yes.
6      Q   Okay. Did you -- Did you take
7  advantage of one of those options?
8      A   Yes, I did.
9      Q   Which option did you chose?
10     A   I chose to go through workers' comp,
11 state.
12     Q   And did you see a psychiatrist?
13     A   Eventually.
14     Q   Okay. What -- What do you mean by
15 "eventually"?
16     A   I was given a psychologist, Dr. Paz --
17 Dr. Paz was the medical doctor. The psychologist
18 was Riley -- Dr. Riley. I requested another
19 doctor almost immediately.
20     Q   Okay. So the first one was Dr. who?
21 It started with a P.
22     A   P-a-z.
23     Q   P-a-z.
24     A   Dr. Paz.
25     Q   And that was a psychologist?

Page 23

1      A   Dr. Paz was the medical doctor.
2      Q   Like a regular doctor?
3      A   Yes.
4      Q   Okay.
5      A   He was over -- He was over everybody
6  else.
7      Q   Okay. And then Dr. Riley was a --
8      A   Psychologist underneath him.
9      Q   Okay. Okay. And then you said you
10 asked to see someone else. Who was that third
11 person?
12     A   I asked for another doctor.
13     Q   Okay. Who?
14     A   It took a year, year and a half before
15 I received one.
16     Q   Who did you get?
17     A   Dr. Entin.
18     Q   That's E-n-t-i-n?
19     A   E-n-t-i-n.
20     Q   And he's a psychiatrist or --
21     A   Yes --
22     Q   -- psychologist?
23     A   -- he is. I requested a second doctor,
24 because by the third time I met with Dr. Riley,
25 two things happened. First of all, he was not

Page 24

1  listening. He was playing on his computer. I
2  stopped talking in the middle of a sentence. It
3  took him 2 or 3 seconds to realize I stopped
4  talking. And then he said, "Yeah, you're
5  wondering if I was listening or not." I said,
6  "Yes, I was."
7          The second reason was by the time I
8  received help that I needed, I was counseling
9  Dr. Riley concerning his own daughter. And I'm
10 thinking, "Why am I helping a doctor? I'm
11 supposed to be here to be helped." So finally
12 they decided that I would -- I could go and see
13 Dr. Entin.
14     Q   Did you feel like Dr. Entin helped you?
15     A   He put me on the road to it -- yes,
16 toward recovery. We were told at the beginning
17 that there were three things. We'd either stay
18 victims, we would try to live a normal life as
19 normal as we could or we could overcome these
20 situations.
21         My desire has always been to -- to get
22 beyond this situation and use it to help others
23 later. I did not want to remain a victim, so I
24 requested help.
25     Q   Okay. So you saw -- you saw Dr. Riley

Page 25

1  for about a year, you said?
2      A   I didn't say that.
3      Q   Oh, okay. I thought you said -- How
4  long did you see him? I'm not trying to put words
5  in your mouth.
6      A   I believe I saw him -- This is what I
7  recall.
8      Q   Uh-huh.
9      A   Probably from 2008 through March of
10 2009, when my husband received -- When he finally
11 got a job, which was at Heath Consultants, he was
12 placed on -- we got the medical insurance. And
13 through that, we went and got checkups, and the
14 doctor -- our primary that we took on suggested
15 that I revisit the psychiatrist that I was seeing
16 before. He was close in that area, and I agreed
17 to go back.
18     Q   And that's how you ended up with
19 Dr. Entin?
20     A   The second time, yes.
21     Q   Okay.
22     A   Uh-huh.
23     Q   So that would have been sometime after
24 2010, because it was after your husband started
25 working at Heath, correct?

**Page 98**

1  A    Yes, he did.
2  Q    Did Mr. Monnig ever curse at employees?
3  A    No, he did not.
4  Q    Did you ever hear Mr. Monnig make any
5  comments that you thought were inappropriate based
6  on anyone's age?
7  A    I can't recall.
8  Q    Did you ever hear anybody at Heath make
9  a comment that you felt was inappropriate based on
10 someone's age?
11 A    The comments that were made were made
12 toward those people who were 40 or above.
13 Q    Okay. Let me maybe define this a
14 little bit. For example, did you ever hear
15 anybody make a joke because of someone's age?
16 A    No, I did not.
17 Q    Did you ever hear someone in management
18 call someone "old" or something like that?
19 A    I don't recall.
20 Q    Okay. Now let me ask it a little
21 different way, because I think I understand what
22 you're saying. Your testimony is that you -- you
23 felt that there were things said to people that
24 you think were being said to them because of their
25 age.

**Page 99**

1       Is that what you're testifying to? I'm
2  just trying to understand your testimony. I'm
3  sorry. I just want to make sure I understand it.
4  I think what you're saying is you never heard
5  anybody directly call somebody "old" or make a
6  joke about someone's age.
7       Fair?
8  A    I don't recall.
9  Q    Okay. But you -- you still think that
10 there was something that said that was
11 inappropriate based on someone's age.
12      Is that also true?
13 A    Yes.
14 Q    Okay. Tell me what that is.
15 A    After Camper -- Excuse me. After
16 Mr. Monnig spoke in a disciplinary manner, what he
17 thought should be discipline about Kathy Canfield,
18 after she left the building he said, "You've got
19 to yell at them or they don't get their work
20 done."
21 Q    Okay.
22 A    He never said that about a younger
23 person.
24 Q    Is there anything else that you think
25 that -- was said by Mr. Monnig or anybody else in

**Page 100**

1  Heath management that you think was inappropriate
2  based on someone's age?
3  A    I don't recall at this point.
4  Q    If you look at Paragraph 17 --
5  A    Uh-huh.
6  Q    -- it talks about your position
7  "required her to do three times the weekly
8  workload without any assistance Monday through
9  Friday."
10 A    Uh-huh.
11 Q    When you say "three times the weekly
12 workload," you're talking about what?
13 A    I was talking about the average
14 workload that I had, you know, up -- prior to that
15 point, yes.
16 Q    Are you talking about the fact that
17 there were just more technicians working during
18 this time, or is there something else you're
19 talking about?
20 A    There were more technicians, more work,
21 yes. Uh-huh.
22 Q    And then it talks about "frequently on
23 Saturday Camper resentfully shared the workload."
24      Why -- Why do you think he resentfully
25 shared the workload?

**Page 101**

1  A    I don't know.
2  Q    Well, this is your complaint, so I
3  would like to know what you -- what you -- what
4  evidence -- evidence you believe establishes that
5  Mr. Camper was resentful for helping you.
6  A    He wanted my position. He wanted to do
7  it.
8  Q    He wanted your job?
9  A    I believe so, yeah.
10 Q    Wouldn't that be a -- Wouldn't that be
11 a step down from a crew leader to an admin
12 position?
13 A    Not if you could stay in the office and
14 not go out.
15 Q    He made more money than you, right?
16 A    I don't know.
17 Q    Do you believe that he made more money
18 than you?
19 A    I don't know.
20 Q    Did he ever tell you that he wanted
21 your job?
22 A    I heard -- I heard him say that he
23 couldn't do the position -- he couldn't do walking
24 like they were requesting these men to do, yes. I
25 heard him say that.

Page 102

1  Q   Okay.
2  A   And I heard Keith agree.
3  Q   When you say he couldn't do the
4  walking, just to make sure I understand --
5  A   Because --
6  Q   -- was there a physical reason or he
7  just couldn't keep up or what was the reason why
8  he couldn't do the walking?
9       MR. MCKENDREE:  Objection to the form
10 of the question, competence.
11 A   I don't know.
12 Q   (By Mr. Barron)  Okay.  So you don't
13 know why he would say that?
14 A   I don't know.
15 Q   So you feel that Mr. Camper wanted to
16 be the admin for the office.  That's your
17 testimony?
18 A   I believe it was something that he
19 wanted to -- would -- would have accepted, yes.
20 Q   Did you think he was trying to force
21 you out of your job?
22 A   Toward the end, I thought so, yes.
23 Q   Why?
24 A   Why would he do it or why --
25 Q   Yeah.  I mean -- I mean, did he give

Page 103

1  you some reason to believe he was trying to force
2  you out of your job?
3  A   Yes, because he began to berate me and
4  belittle me.
5  Q   Okay.  Give me an example.
6  A   Give you an example?  I'm sorry.  I --
7  Oh, my gosh.  Can I have a break?
8  Q   Sure.
9  A   Thank you.
10 Q   Yep.
11      THE VIDEOGRAPHER:  We're off the record
12 at approximately 11:20 a.m.
13      (Recess from 11:20 a.m. to 11:30 a.m.)
14      THE VIDEOGRAPHER:  We're on the record
15 at 11:30 a.m.
16 Q   (By Mr. Barron)  Ms. Applegate, you
17 understand we're back on the record?
18 A   Yes, I do.
19 Q   When we left off, we were talking about
20 Jason Camper, and you were saying that he berated
21 you and was rude to you and things like that.
22      Do you recall that testimony?
23 A   Yes.
24 Q   Okay.  And I asked you for an example.
25 You've had some time to think about it now.  Can

Page 104

1  you give me an example?
2  A   When he called me "a damn, fucking
3  woman."
4  Q   Okay.  The one we talked about earlier
5  today?
6  A   Yes.
7  Q   Anything else?
8  A   I don't recall.
9  Q   When you were working with Mr. Camper
10 on Saturdays, would it just be the two of you in
11 the office?
12 A   Yes, sir.
13 Q   And those would be pretty long days,
14 right?  Sometimes 10 hours?
15 A   Yes, sir.
16 Q   Did y'all get along?
17 A   Yes, we did.
18 Q   I mean, y'all would talk about just,
19 you know, whatever is going on in your lives,
20 right?
21 A   We didn't have time for that.
22 Q   So you didn't --
23 A   No, sir.
24 Q   You didn't talk at all.  It was just
25 strictly business?

Page 105

1  A   Yes, sir.
2  Q   You didn't talk about your kids or
3  anything like that?
4  A   No, sir.
5  Q   I want to direct your attention now to
6  the week of Thanksgiving 2013.
7  A   Uh-huh.
8  Q   I believe that's the week when there
9  were some issues that ultimately ended up
10 resulting in termination.
11      Do you recall that time period?
12 A   Yes, sir.
13 Q   So if you look at Paragraph 18 of the
14 complaint, that's --
15 A   Okay.
16 Q   -- where that section starts.  It says
17 on Friday, November 22nd, you spoke with
18 Mr. Monnig requesting help in making hard copies
19 for the week of Thanksgiving.
20      Is that true?
21 A   Yes, sir.  Uh-huh.
22 Q   What did he tell you, if anything?
23 A   He didn't respond.
24 Q   He didn't respond at all?
25 A   No, he did not.

**Page 106**

1  Q   Was this a verbal request or an e-mail,
2  or . . .
3  A   Verbal.
4  Q   And he just sat there mute and didn't
5  say anything?
6  A   Yes, sir.
7  Q   All right. And you didn't follow up or
8  ask -- ask again?
9  A   No, sir.
10 Q   How do you know he heard you?
11 A   I was standing in front of him.
12 Q   And you asked him a question and he
13 just ignored you?
14 A   Yes, sir.
15 Q   Later in Paragraph 18, it says "it was
16 common practice for Crew Leaders to assist in
17 completion of holiday workload."
18     Why do you believe that was common
19 practice?
20 A   It was a short week. I had the same
21 amount of paperwork, basically, reports and
22 everything, yes.
23 Q   So that was Friday. Did you work that
24 Saturday?
25 A   Yes, I did.

**Page 107**

1  Q   And Mr. Camper helped you?
2  A   Yes, he did.
3  Q   And what exactly were you doing on
4  Saturday?
5  A   We were finishing up the payroll for
6  that week.
7  Q   And what does that include exactly? Is
8  there some data entry involved in that?
9  A   Data entry, yes. Uh-huh.
10 Q   And once you've entered all the data
11 properly, then what do you do? Do you have to
12 print it out?
13 A   It's sent to payroll, yeah.
14 Q   Okay. Is -- My understanding is that
15 you make a -- there's, like, a packet and then you
16 have to make copies of that.
17     Is that true?
18 A   Not on Saturday.
19 Q   Okay. So what do you do on Saturday?
20 A   We make sure all the data's in -- in
21 the computer and it's sent directly to HR.
22 Payroll is complete.
23 Q   Okay. So, then, what are the, quote,
24 copies that we've heard some discussion about?
25 What are the -- What is that process?

**Page 108**

1  A   That happens the next week.
2  Q   Okay. So once the data is entered,
3  then you have to make copies for, like, the gas
4  company and the file and things like that?
5  A   The next week.
6  Q   All right. So that would have started
7  on Monday, November 25th, right?
8  A   Yes, sir. Uh-huh.
9  Q   And normally you would be the one that
10 would actually make the copies after the data was
11 already entered, correct?
12 A   Yes, sir.
13 Q   So Camper would help you with the data
14 entry -- in this case, on Saturday -- but it would
15 not be common, for example, for Mr. Camper to help
16 you make copies during the week, right?
17 A   That feels like two questions. I'm
18 sorry.
19 Q   Okay. I'll try to break it up. That's
20 okay. If I -- If you don't understand any of my
21 questions, just ask.
22 A   I don't understand it.
23 Q   Okay.
24 A   Thank you.
25 Q   I -- I believe your testimony has been

**Page 109**

1  that Mr. Camper would help you with the data entry
2  piece, right?
3  A   Yes, uh-huh.
4  Q   And in this case, that happened on the
5  Saturday -- I believe it was November 23rd?
6  A   Yes.
7  Q   All right. So once that piece of the
8  work was done, wasn't it the typical practice for
9  you, by yourself, to actually make the copies?
10 A   Yes, sir.
11 Q   And how long did that -- that work
12 typically take, making the copies?
13 A   4-1/2 hours.
14 Q   In Paragraph 19, it says on Monday,
15 "Ms. Applegate reminded Monnig that help would be
16 needed to make copies in order for the payroll to
17 be completed; Monnig responded by stating, 'You
18 will have two Crew Leaders to help you tomorrow.'"
19     Do you see that?
20 A   Yes, I do.
21 Q   Okay. Tell me about that conversation.
22 A   He was in the back room. I went to
23 him. I said, "I will need" -- "I will need help
24 with making copies since this was a short week."
25 Q   When did the copies have to be

Page 110

1  completed?
2      A   The copies should have been completed
3  probably Tuesday morning.
4      Q   Why did they have to be completed by
5  Tuesday morning?
6      A   So Keith can take it to the client.
7      Q   So why couldn't you have done the
8  copies on Monday?
9      A   I didn't have time.
10     Q   Why didn't you have time?
11     A   I left -- I left at my regular hours
12 of 3:30.  I had a doctor's appointment.  I didn't
13 stay late.
14     Q   But you said it takes about 4 to 4-1/2
15 hours to make the copies, correct?
16     A   That's just the copy work.  That's not
17 all I did.
18     Q   Okay.  Well, I want to understand
19 what -- what --  After the work was done on
20 Saturday --
21     A   Uh-huh.
22     Q   -- what was left to be complete for
23 Mr. Monnig to be able to take it to the gas
24 company?
25     A   They needed to be --  They needed to be

Page 111

1  collated.  The maps and the paperwork and -- had
2  to be placed together, put together.  They --
3  Taken from the district to --  They had to be put
4  in district form to be taken to the different --
5  to the client.  There were several districts.
6      Q   So this was just basically copying and
7  then organizing.  Would that be the way to
8  describe it?
9      A   Reading the maps, making sure
10 everything's correct.
11     Q   How --
12     A   If there's any corrections, then they
13 have to be completed before anything goes out.
14     Q   And how long would that process take to
15 do, what you just described?
16     A   It would take a whole day and longer.
17     Q   And your testimony is that had to be
18 done by Tuesday morning?
19     A   That was --  That was the regular time,
20 yes.
21     Q   So if that work had to be done by
22 Tuesday morning, why wouldn't you have worked on
23 it on Monday?
24     A   I did.
25     Q   You did?

Page 112

1      A   Yes, I did.
2      Q   Okay.  What part of that job did you do
3  on Monday?
4      A   All of my responsibilities.
5      Q   So you did the copying, you did the
6  organizing, you finished it yourself on Monday?
7          Is that your testimony?
8      A   I did not do the copying.
9      Q   Okay.  What did you do --  What exactly
10 did you do on Monday?
11     A   I prepped the files for the next
12 week -- for that week of the Thanksgiving weekend.
13     Q   If you look at Paragraph 20, it says
14 you prioritized the workload and manually prepped
15 electronic files to complete Wednesday.
16     A   Yes.
17     Q   What does -- "Manually prepping
18 electronic files," what is that?
19     A   I had to go into the computer, into
20 each tech's work and physically change the dates,
21 the times, the amounts, put in new information
22 concerning the -- the Thanksgiving weekend.  And
23 there were 47 of them to do.
24     Q   How long did that take?
25     A   Because I had been told by Keith that I

Page 113

1  would have someone to help with hard copies -- two
2  crew leaders would help me with hard copies, I set
3  that aside and I got ready for that week's
4  payroll.
5      Q   Were there any witnesses to
6  Mr. Monnig's -- to Mr. Monnig telling you that you
7  would have two crew leaders to help you tomorrow?
8      A   I don't know.
9      Q   Well, you didn't see anyone around that
10 might have overheard that conversation?
11     A   We were standing in the back room with
12 all the techs walking around.
13     Q   Did you normally ask for help from
14 Mr. Monnig in making copies or was this something
15 out of the ordinary?
16     A   It was something that I would speak to
17 him about, yes.
18         MR. BARRON:  I'm going to object to
19 that as being non-responsive.
20     Q   (By Mr. Barron)  My question was, was
21 it typical or ordinary for you to ask Mr. Monnig
22 for the crew leaders to help you with making
23 copies?
24     A   I didn't ask him to have crew leaders
25 help me.  I don't understand your question.

**Page 122**

1  Q    So you did not understand that you were
2  allowed to go home early as well?
3  A    I don't understand your question.
4  Q    Did you -- Did you expect to be there
5  all day or did you --
6  A    Yes, I did, sir.
7  Q    Okay. You didn't expect to leave early
8  like the technicians were leaving?
9  A    I did not, sir.
10 Q    Did anybody ever tell you that you had
11 to stay there all day or was there any discussion
12 about what your schedule was going to be like on
13 that Wednesday?
14 A    Nothing was discussed.
15       (Mr. Gallego entered the room.)
16 Q    (By Mr. Barron) In Paragraph 24, it
17 says that you were working on payroll when Jason
18 Camper brought a new tech to your -- to your
19 office. Who was the new tech?
20 A    I don't recall.
21 Q    And there was a discussion about an
22 answer concerning an error on that technician's
23 paperwork.
24       Do you remember that?
25 A    Yes, sir.

**Page 123**

1  Q    Tell me what you remember about that
2  conversation.
3  A    He came in with a map and his friend --
4  or, excuse me -- the tech and asked about
5  paperwork that had happened -- whether the map was
6  completed or not. I said, "I found" -- "I went
7  back to the map. I found the information. I've
8  corrected it."
9  Q    Okay. What happened next?
10 A    He asked again, "What about this?" And
11 then he asked a third time.
12 Q    And do you know why --
13 A    I was in the middle -- I was typing
14 while he was asking me.
15 Q    Did you answer his question the first
16 time?
17 A    Yes, I did, sir.
18 Q    Then do you know why he would ask you a
19 second and third time?
20 A    I do not know.
21 Q    Do you know if he heard you the first
22 time?
23 A    Yes, he did, sir. I made eye contact.
24 Q    Did you have your own office?
25 A    Yes, sir.

**Page 124**

1  Q    Okay. Where was your office in
2  relation to Keith's office?
3  A    His was just across the hall.
4  Q    Okay. In the complaint, you say that
5  he was towering above you in a very intimidating
6  demeanor. What do you mean by that? We're
7  talking about Mr. Camper?
8  A    I was sitting at my computer typing, at
9  the counter.
10 Q    Right.
11 A    I have a window in front of me, like a
12 receptionist's window. He was standing -- bending
13 over on top of that above me when he was speaking.
14 Q    So he was not even in your office. He
15 was looking --
16 A    He was on the other side of the wall,
17 yes.
18 Q    Okay. So he was looking through that
19 window to talk to you, right?
20       MR. MCKENDREE: Object to the form of
21 the question.
22 Q    (By Mr. Barron) You can answer.
23 A    I was typing. I know he was leaning
24 over me.
25 Q    Okay. And did you feel that was

**Page 125**

1  inappropriate?
2  A    I felt intimidated.
3  Q    Why?
4  A    By the deflection (sic) in his voice.
5  Q    Was there something specific about his
6  voice that intimidated you?
7  A    He continued to ask the same question
8  over and over until he got the response that he
9  wanted.
10 Q    What was the response that he wanted?
11 A    I said, "Stop. Leave me alone."
12 Q    You think that was the response that he
13 wanted?
14 A    Yes, I do.
15 Q    You think he wanted you to yell at him?
16 A    I didn't yell, sir.
17 Q    Okay. Well, what was your tone of
18 voice when you said, "Stop. Leave me alone"?
19 A    I said, "Stop. Leave me alone."
20 Q    And you don't consider that to be
21 yelling?
22 A    No, I did not.
23 Q    You don't see anything wrong with the
24 supervisor asking you a question and you telling
25 him "Stop. Leave me alone"?

**RETHA APPLEGATE**

### Page 126

1  A   He's not my supervisor.
2  Q   So you don't feel like you had to -- to
3  listen to what he had to say or -- when he asked
4  you questions?
5  A   No. I disagree with that.
6  Q   Okay. He is a supervisor at Heath,
7  correct?
8  A   Yes, he is, sir.
9  Q   And he was above you in the chain of
10 command, right?
11 A   He was not.
12 Q   What authority do you have that he was
13 not above you in the chain of command? Is that
14 just your personal belief or -- or is there a
15 document or something that reflects that?
16     MR. MCKENDREE: That's, like, three
17 questions, Counsel.
18     THE DEPONENT: I agree.
19     MR. MCKENDREE: Can you break it down?
20 Q   (By Mr. Barron) What's your --
21 A   It was.
22 Q   What's your basis for your opinion that
23 he was not your supervisor?
24 A   Oh, the basis is that when I was hired,
25 I was told by Keith Monnig that I was directly

### Page 127

1  underneath him and crew leaders on the other side
2  are directly beneath him. I was given that chain
3  of command --
4  Q   So --
5  A   -- when I was hired.
6  Q   -- if a crew leader walked up to you
7  and asked you to do something, would you do it?
8  A   I would gladly, if I could, sure.
9  Q   And you're just doing it out of the
10 goodness of your heart, not because it's a
11 supervisor asking you to do it?
12     MR. MCKENDREE: Object to the form of
13 the question.
14 A   I would do it if I could, sir, yes.
15 Q   (By Mr. Barron) And my question is why
16 would you do it? Would you do it because that's a
17 supervisor asking you to do it --
18 A   No.
19 Q   -- or just because you're a nice
20 person?
21 A   Because I would do it.
22 Q   If Mr. Camper told you to go clean the
23 bathroom, would you do it?
24 A   Mr. Camper was not my supervisor.
25 Q   So you would tell -- You feel like you

### Page 128

1  had the ability to tell him, "No, I'm not going to
2  do that"?
3  A   If he asked me to do -- It would be
4  something that would have to go through Keith.
5  Q   Have you ever told Mr. Camper, "You're
6  not my supervisor"?
7  A   I did not say that, no.
8  Q   So you don't know whether he believed
9  he was your --
10 A   He knew.
11 Q   -- supervisor? Excuse me?
12 A   He knew.
13 Q   How did he know?
14 A   When I was first hired, Keith was
15 sitting -- Keith, myself and Mr. Camper were
16 sitting at the conference table in the back. I
17 had put my feet up on one of the chairs. We were
18 waiting for the techs to come in so that we could
19 start, you know, on the payroll. Jason Camper
20 said, "Get your feet off the chair."
21     Keith Monnig said, "She's not under
22 you. You're not her supervisor."
23 Q   Okay. So you were allowed to keep your
24 feet on the chair, right?
25 A   Keith Monnig said that I could keep my

### Page 129

1  feet on the chair.
2  Q   Okay. So after you told Camper, "Stop.
3  Leave me alone," what happened next?
4  A   I went back to work.
5  Q   About --
6  A   I continued putting in the information.
7  Q   What -- About what time was this?
8  A   I don't know.
9  Q   No idea?
10 A   I -- I would say between maybe 11:30
11 and noon.
12 Q   Did you have any other discussions with
13 Camper on that particular day?
14 A   Yes, I did.
15 Q   Okay. Tell me about that.
16 A   I spoke to him after I had left Keith's
17 office.
18 Q   And what did you say to him?
19 A   I was slurring my words. I saw him
20 sitting there and knew he was the reason I had
21 been called into the office.
22 Q   Did you say something to him?
23 A   Yes, I did.
24 Q   What did you say?
25 A   "I" -- "I'm sorry."

**Page 130**

1  Q   You said it in that way?
2  A   Yes, I did.
3  Q   All right.  What was his response?
4  A   He didn't say anything.
5  Q   Any other words with Mr. Camper that
6  day?
7  A   I don't believe so.
8  Q   All right.  You mentioned a meeting
9  with Mr. Monnig.  Tell me about that meeting.
10  A   "Retha, my office."  I went to his
11  office.
12  Q   And what happened next?
13  A   "No yelling in the office."
14      I said, "I wasn't yelling."
15  Q   Okay.  Anything else?
16  A   I tried to explain that I didn't
17  understand why I was brought in and I wanted to
18  leave.  I needed to get payroll done.
19  Q   Okay.  What did he say?
20  A   "When your supervisor tells you to do
21  something, you do it.  When my supervisor tells me
22  to do something, I do it.  Sit down."  So I looked
23  around the room and found a place and sat down.
24  Q   Okay.  Then what happened?
25  A   He wouldn't let me leave.

**Page 131**

1  Q   Was he talking to you?  What was he
2  doing?
3  A   "You're not going to leave until you
4  tell me what you were saying" -- "what you were
5  going to say."
6      I said, "I don't remember."
7  Q   Okay.  What happened next?
8  A   I was leaning against -- I was on the
9  floor -- 18 inches off of the floor, the only
10  place to sit in the office, leaning against a
11  desk.  I said, "I am not" -- "I don't feel well."
12  Q   Okay.  What did he say?
13  A   He didn't respond.  I don't recall.
14  Q   Well, do you recall anything else about
15  that discussion?
16  A   I realized, unless I said "Sorry,"
17  which is the only -- That would be the only way I
18  could get out of the room.
19  Q   Sorry for what?  For yelling?
20  A   Just the word.
21  Q   How long were you in that -- that
22  meeting with Mr. Monnig?
23  A   5, 10 minutes.  15, maybe.  I don't
24  know.
25  Q   Did --

**Page 132**

1  A   I don't recall.
2  Q   Did you check your watch?  How do you
3  know it was 5 or 10, 15 minutes?
4  A   I don't recall.
5  Q   When you told him that you didn't feel
6  well, what did he say?
7  A   I don't recall.
8  Q   Did you tell him that you were --  What
9  exactly did you tell him about not feeling well?
10  A   "I don't feel well."
11  Q   And that's all you said?
12  A   That's what I said.
13  Q   Okay.  You didn't say "I'm dizzy" or "I
14  feel like I'm going to pass out"; anything like
15  that?
16  A   No, sir.
17  Q   Had --  Had you had any sort of history
18  at Heath of -- of having medical issues at work?
19  A   I don't understand the question.
20  Q   All right.  You told Mr. Monnig that
21  you didn't feel well, right?
22  A   Yes.
23  Q   Okay.  Had --  Had there been any
24  other -- on prior instances, situations where you
25  didn't feel well at work?

**Page 133**

1  A   I don't recall.
2  Q   Do you feel that Mr. Monnig did
3  something inappropriate by -- by asking you to
4  stay in the room and talk to him?
5  A   Yes, sir.
6  Q   Okay.  And --  And why do you think
7  that was inappropriate?
8  A   I asked to leave.
9  Q   You think he should just let you leave?
10  A   I asked why I was there, and he
11  couldn't give me an answer.  He -- I -- I'm
12  wondering why --  I didn't even know why I was in
13  the room.
14  Q   Well, you know that -- or you believe
15  that Mr. Camper went and made a complaint about
16  the fact that you told him to "Leave me" --
17  "Stop.  Leave me alone," right?
18  A   When he left me, he -- he went to the
19  back area, came -- I saw him and Keith Monnig
20  walking to the office.
21  Q   Well, isn't it true that he started --
22  Mr. Monnig started the conversation with "No" --
23  "No yelling in the office," right?
24  A   Yes, sir.
25  Q   And that happened right after you were

**Page 138**

1    AFTERNOON SESSION   1:10 p.m.
2       THE VIDEOGRAPHER:  This begins Tape 3.
3  We're on the record at 1:10 p.m.
4       EXAMINATION (Continued)
5  BY MR. BARRON:
6    Q   Ms. Applegate, you understand we're
7  back on the record?
8    A   Yes, uh-huh.
9    Q   When we left off, we were walking
10 through the timeline of events Thanksgiving week.
11      Do you recall that?
12   A   Yes.
13   Q   And I believe we left off with you on
14 Wednesday, going back into Mr. Monnig's office and
15 telling them that you did not appreciate the way
16 you were treated.  This is exactly how Mary Strawn
17 felt?
18   A   Yes, sir.
19   Q   Okay.  Do you remember anything else
20 that you said to Mr. Monnig when you went back
21 into his office?
22   A   That's all I said, sir.
23   Q   Okay.  What did he say?
24   A   "Call your husband."
25   Q   Anything else?

**Page 139**

1    A   I don't recall.
2    Q   So what did you do?
3    A   I went to my -- my -- my desk and
4  started working on the payroll.
5    Q   Did you call your husband?
6    A   Yes, I did.
7    Q   What did you tell him?
8    A   I said, "You need to come get me to go
9  home."
10   Q   Was he already done for the day?
11   A   Technicians were supposed to be in by
12 noon, so, yes, it was close to the end of his day.
13   Q   Okay.  Did you tell him that you were
14 suspended or disciplined in any way?
15   A   I did not.
16   Q   At that point, did you believe you were
17 suspended?
18   A   I knew I was going home.  Did I know I
19 was suspended?  No, I did not.
20   Q   Did you think you were being
21 disciplined?
22   A   I didn't know --
23   Q   All you knew --
24   A   -- what was happening.
25   Q   All you know is your supervisor told

**Page 140**

1  you to go ahead and go home?
2    A   Yes, in a -- in a rough voice.
3    Q   But this was about your normal time to
4  go home anyway on that day because everybody was
5  leaving early, right?
6    A   No, sir.
7    Q   Why do you say no to that answer?  I
8  mean, your -- your husband was getting off work
9  about that time, right?  All the technicians were
10 going home, right?
11   A   Uh-huh.  Yes, sir.
12   Q   And your supervisor tells you to go
13 ahead and go home, right?
14   A   If my -- my supervisor told me to go
15 home -- He told me to go home, yes.
16   Q   Right.  And --
17   A   I did not expect to stay until noon.  I
18 expected to stay until 6 o'clock, yes.
19   Q   Why did you expect to stay until
20 6 o'clock?
21   A   To finish the paperwork.
22   Q   Did you think Keith Monnig was going to
23 be there until 6 o'clock?
24   A   I don't know.
25   Q   Did he tell you he expected you to stay

**Page 141**

1  until 6 o'clock?
2    A   It was unwritten, sir.
3    Q   It was -- It was what?
4    A   It was unwritten.  It was expected.
5  You don't leave --  I've been told "You do not
6  leave the office until payroll is complete."
7    Q   All right.  But was there any
8  discussion that day about what time you would be
9  leaving before he told you go home?
10   A   No, sir.
11   Q   Did you feel like you were being
12 punished in any way when he told you to go home?
13   A   I knew -- I knew he was angry.
14   Q   How did you know he was angry?
15   A   By the inflection in his voice.
16   Q   How long was it before your husband got
17 there?
18   A   Probably 15, 20 minutes.  I don't know.
19   Q   What did you do in that 15, 20 minutes?
20   A   I sat at the computer and worked on
21 payroll.
22   Q   Did Mr. Monnig or Camper or anybody
23 talk to you during that 15, 20 minutes?
24   A   Monnig came out.  "Where's your purse?"
25      "Right here."

**Page 150**

1  Q   Did you have any conversations with
2  anybody at Heath from Wednesday when you left
3  until the Monday after Thanksgiving when you came
4  to work?
5  A   No, I did not.
6  Q   Do you know if your husband did?
7  A   I believe he called somebody.  I don't
8  know.
9  Q   Okay.  But you weren't privy to that
10 conversation?
11 A   No.
12 Q   Tell me what happened on Monday,
13 December 2nd when you came to work.
14 A   We walked in the door.  Keith's
15 standing in his -- in the office.  There's a
16 doorway.  It's, like, two steps -- two steps away.
17 He says, "You're suspended."
18 Q   Do you recall him saying anything else?
19 A   We -- We asked if it's paid or unpaid.
20 And he goes, "Paid."
21 Q   Anything else that you can recall?
22 A   Not right now, no.
23 Q   And what did you say?
24 A   I don't -- I don't remember.
25 Q   Do you remember your husband saying

**Page 151**

1  anything?
2  A   I don't recall at this time, no.
3  Q   Do you remember him saying "We're not
4  going down without a fight"?
5  A   Yes, he did say that.  Uh-huh.
6  Q   Was he loud when he said that?
7  A   He said it to Keith.  Keith was
8  standing right there in front of the conference --
9  the back area.  The second time, yes, he said it
10 louder so the others behind that, the ones that
11 are in there could hear it.
12 Q   So he said it twice?  He made that
13 statement --
14 A   Yes, he did --
15 Q   -- twice?
16 A   -- sir.
17 Q   He wanted to make sure everybody heard
18 it?
19 A   Yes, he did, sir.
20 Q   Do you remember your husband saying
21 anything else on that Monday morning?
22 A   I don't recall.
23 Q   Do you think it was appropriate for
24 your husband to say "We're not going down without
25 a fight"?

**Page 152**

1  A   Yes, sir.
2  Q   Do you think that was a good idea to
3  say that to a supervisor?
4  A   He said it to the people in the back --
5  Q   Why would he need --
6  A   -- and to the supervisor, yes.
7  Q   Why would he need to say it to the
8  people in the back?
9  A   So that they would be able to document
10 what he said.
11 Q   Let me just ask you this:  Wouldn't it
12 have been perhaps a better idea, in hindsight, to
13 have simply politely left that Monday morning and
14 waited to see what happened?
15 A   Sure.
16 Q   Would you agree that that maybe would
17 have de-escalated the situation instead of
18 escalating it further?
19     MR. MCKENDREE:  Objection, competence.
20 A   It would -- It would not have
21 escalated it.
22 Q   (By Mr. Barron)  And -- But at this
23 point, no one from Heath had told you or your
24 husband that you were fired, correct?  You were
25 just suspended.

**Page 153**

1  A   Not at this point, no.
2  Q   Do you think your husband saying "We're
3  not going down without a fight" perhaps had
4  something to do with the fact that you guys were
5  fired?
6     MR. MCKENDREE:  Same objection.
7  A   Not at all.
8  Q   (By Mr. Barron)  Not at all?
9  A   Not at all.
10 Q   Do you think that you would have been
11 fired had he not made that comment on Monday
12 morning when you came in?
13    MR. MCKENDREE:  Same objection.
14 A   Absolutely.
15 Q   (By Mr. Barron)  And why -- why do you
16 believe that?
17 A   Because he got angry when I said "This
18 is exactly how Mary Strawn was treated."
19 Q   At any -- On any occasion between the
20 Wednesday and up to the Monday so far, did you
21 ever tell your husband, you know, maybe afterwards
22 when you were alone, "You know, hey, I wish you
23 hadn't of said that" or "Maybe we should have
24 handled this differently"?
25 A   No, I did not.

**Page 186**

1  A    Yes, I saw that.
2  Q    You're making a retaliation claim in
3  this case.
4       Do you -- Do you understand that?
5  A    Yes, sir.
6  Q    What do you feel that you were -- What
7  did you do that you believe caused you to be
8  retaliated against?
9  A    I made a comparison to how I was
10 treated in comparison to how Mary Strawn had been
11 treated.
12 Q    Okay.  And you're referring to your
13 comment to Mr. Monnig?
14 A    Yes, sir.  Uh-huh.
15 Q    Okay.  Any other complaints that you
16 made that you feel resulted in retaliation against
17 you?
18 A    I don't recall at this time, sir.  I
19 don't think so.
20 Q    Okay.  Did you file for unemployment
21 when you left -- when you were terminated from
22 Heath?
23 A    Yes, I did, sir.
24 Q    Did you receive unemployment?
25 A    Absolutely.

**Page 187**

1  Q    Have you had any jobs since your
2  termination from Heath?
3  A    Not in the workplace.
4  Q    All right.  You have since moved to
5  Kansas, correct?
6  A    Uh-huh.  Yes, sir.
7  Q    And you moved to Kansas because of some
8  health issues suffered by your mother?
9  A    Yes, sir.
10 Q    Parkinson's, I understand, right?
11 A    Yes.
12 Q    Okay.  And she is now currently --
13 You're taking care of her part of the week?
14 A    Yes, part-time.
15      (Ms. Oliveros entered the room.)
16 A    Actually -- Actually, it's full-time
17 but the two of us --
18 Q    (By Mr. Barron)  Split?
19 A    Yes, we split.
20 Q    You and your sister?
21 A    Yes, my sister and I.
22 Q    Do you receive any payment for taking
23 care of your mother?
24 A    We do have compensation, yes --
25 Q    Okay.

**Page 188**

1  A    -- for her care.
2  Q    And how much are you compensated for
3  that?
4  A    $2,000 a month.
5  Q    Who pays you that money?
6  A    Myself -- I, myself -- Excuse me.  My
7  sister and I are both power of attorneys for my
8  mom.
9  Q    Okay.
10 A    And I am her executress.
11 Q    So, basically, she had an account, I
12 assume --
13 A    Yes.
14 Q    -- and then you -- you take money out
15 of that account to --
16 A    Rather than place her in a nursing
17 home, where she belongs right now, we're taking
18 care of her --
19 Q    Okay.
20 A    -- yes.
21 Q    By the way, my father had Parkinson's,
22 so I'm very familiar with that process, so . . .
23 A    Thank you.
24 Q    Okay.  Any other sources of income
25 since leaving Heath?

**Page 189**

1  A    For myself, or . . .
2  Q    For you, yeah.
3  A    Oh, I don't think so.  I've been -- I
4  was unemployed until --
5  Q    When did the $2,000 a month start, just
6  roughly a ballpark?
7  A    October --  When we first moved out
8  there.
9  Q    Okay.  October of 2014 or '15?
10 A    '15.
11 Q    Last year?
12 A    Yeah.
13 Q    Okay.
14 A    Uh-huh.
15 Q    Do you -- Do you think you would
16 have -- Based on your mother's health condition,
17 do you think you would have had to have moved to
18 Kansas even if you would have still been working
19 for Heath at that time?
20 A    No.
21      MR. MCKENDREE:  Objection, competence.
22 Q    (By Mr. Barron)  Okay.  So --
23 A    No, sir.
24 Q    So if you -- you would have still had
25 your job at Heath and -- and your husband still