IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No. 1:16-cv-00648-RPM

RETHA APPLEGATE and
ERNEST APPLEGATE,

    Plaintiffs,

v.

HEATH CONSULTANTS, INC.,

    Defendant.

---

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Retha Applegate and Ernest Applegate are married. Both were employed by Defendant Heath Consultants, Inc. ("Heath"), and both were fired on December 3, 2013.

The Applegates filed this civil action in the District Court for the City and County of Denver on March 1, 2015, claiming age discrimination and retaliation under both the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623 *et seq.*, and the Colorado Anti-Discrimination Act ("CADA"), C.R.S. § 24-34-402. Defendant Heath removed the case to this Court.

After discovery, Heath moved for summary judgment of dismissal. That motion was fully briefed, and oral arguments were heard on July 18, 2017.

**Timeliness of Plaintiffs' EEOC Charge**

Heath contends that Plaintiffs failed to meet the ADEA requirement that an EEOC charge must be filed within 300 days of the alleged discriminatory action, which time expired on September 28, 2014. The EEOC received a letter from former counsel for the Applegates on September 29, 2014, a Monday. Counsel also sent an intake questionnaire for Retha Applegate, which alleges the discrimination complained of in this case. The letter stated its purpose was to file an administrative complaint on behalf of "Retha and Ernest Applegate, for age . . . discrimination, hostile workplace, and retaliation against their former employer, Heath Consultants, Inc.," and requested the agency issue a charge of discrimination. [Sept. 29, 2014 Letter, Ex. 2 to Pls.' Opp'n, Doc. 26-4 at 1, 4.] It is apparent that Plaintiffs' former lawyer was not aware of the appropriate procedure. Formal charges for both plaintiffs were filed on October 27, 2014. The EEOC treated the September 29, 2014 letter as a timely filed charge supplemented by the October 27 filings, and this Court accepts that decision as within agency discretion. *See Semsroth v. City of Wichita*, 304 F. App'x 707, 713-14 (10th Cir. 2008) (whether EEOC treated document as charge informs determination of whether such document can reasonably be construed as request for agency action).

**Undisputed Facts**

Defendant's brief in support of its summary judgment motion includes a statement of undisputed facts that Plaintiffs admitted, denied, and supplemented in their response. Based on those statements, the following facts are not in dispute:

Defendant Heath is a manufacturer and consulting firm headquartered in Houston, Texas. Heath employs workers nationwide, including in Denver, Colorado. Plaintiff Retha Applegate began employment as an administrative assistant in Heath's Denver office on or

about November 2, 2010 when she was fifty-three years old. Plaintiff Ernest Applegate began employment as a field technician in Heath's Denver office on or about August 10, 2010 when he was fifty-seven years old. Ms. Applegate formerly worked as a paraprofessional at Platte Canyon High School in Bailey, Colorado, where a school shooting incident occurred on September 27, 2006. That traumatic experience caused Ms. Applegate severe emotional distress (for which she sought and received medical treatment) and continuing emotional fragility.

      Ms. Applegate's responsibilities as an administrative assistant included making hard copies of data entries relating to Heath's payroll. On Friday, November 22, 2013, Ms. Applegate asked Heath project manager Keith Monnig for help making copies of the payroll data entries that needed to be submitted the following Tuesday. Mr. Monnig did not respond to Ms. Applegate's request for help. On Monday, November 25, 2013, Ms. Applegate again asked Mr. Monnig for help making the copies. Ms. Applegate left the office on Monday without making the copies that needed to be submitted to Heath's clients the following day. On the morning of Tuesday, November 26, 2013, Mr. Monnig summoned Ms. Applegate to his office to discuss her failure to complete the copying task.

November 27, 2013 – Alleged Yelling in the Office

On Wednesday, November 27, 2013, a Heath crew leader, Jason Camper, approached Ms. Applegate to inquire about an error on a technician's paperwork. She responded that she had already taken care of the error. In response to Mr. Camper's continued inquiries regarding the paperwork, Ms. Applegate pushed her chair away from her computer, put her hands up in a defensive manner, and said "Stop. Leave Me alone." Mr. Monnig immediately summoned Ms. Applegate to his office and admonished her for yelling in the office. After leaving Mr. Monnig's office, Ms. Applegate apologized to Mr. Camper. Ms. Applegate then returned to Mr. Monnig's office in some distress, and Mr. Monnig asked her to contact her husband, Mr. Applegate, to come pick her up and take her home for the day. Mr. Applegate arrived to take Ms. Applegate home, and Plaintiffs left the building. Mr. Applegate then returned to speak to Mr. Monnig about the incident; Mr. Applegate spoke to Mr. Monnig "in a loud voice" and asked Mr. Monnig to "step outside." Mr. Monnig did not respond, and Mr. Applegate left with his wife. Five Heath employees, including Mr. Monnig and Mr. Camper, completed "incident reports" concerning their observations of this incident.

December 2-3, 2013 – Suspension and Termination

When Plaintiffs returned to work on Monday, December 2, 2013 (after the Thanksgiving holiday), Mr. Monnig informed them that they were being placed on paid suspension as a result of their actions the previous week. Mr. Applegate twice responded that "we're not going down without a fight," adding that "I haven't learned to grovel well." Two Heath employees, including Mr. Camper, completed incident reports regarding the events of Monday, December 2, 2013. When Plaintiffs arrived to work on Tuesday, December 3, 2013, Mr. Monnig told them that their employment with Heath was being terminated, effective immediately. Mr. Monnig then instructed Mr. Camper to summon the police to escort the Applegates from the property. Arapahoe County Deputy Sheriffs arrived. Their "offense report" states that upon the officers' arrival, one of the officers felt the need to pat Mr. Applegate down due to his "elevated demeanor," which included "yelling and pacing." [Dec. 3, 2013 Offense Report, Ex. F to Def.'s Mot., Doc. 23-8 at 2.] According to the officer, he had to tell Mr. Applegate several times to lower his voice and quit yelling, and Mr. Applegate "appeared to be extremely angry [and] agitated." [*Id.* at 2-3.] The report further states that Ms. Applegate "began to hyperventilate, was unable to speak or make sense, and slumped to the asphalt and onto her side." [*Id.* at 3.] Accordingly, the officers called for an ambulance, and Ms. Applegate was eventually transported to the hospital. [*Id.*]

Heath Employment Policy

Heath maintains a "Personal Integrity and Conduct" policy whereby "employees are expected to conduct themselves in a manner that ensures a positive, safe, and efficient work environment." [Heath Employee Manual (2012 ed.), Ex. G to Def.'s Mot., Doc. 23-9 at 9.] The policy further provides that "[i]mproper conduct may result in corrective action or, in extreme cases, termination of employment." [*Id.*] The policy states that

> **Major** offenses are those so grave in nature that a single offense may justify taking immediate, formal corrective action, including termination, without prior formal warning. Any MAJOR offense may require suspension of an employee pending an investigation and review of the situation; discharge may be appropriate upon the first violation. Discharge is normally enacted in cases of MAJOR offenses or where previous efforts to bring about correction have failed.

[*Id.*] According to the policy, major offenses include:

1. Fighting with, threatening, harassing, . . . or intimidating any individual.
. . . .
10. Immoral, indecent or disorderly conduct, including actions that interfere with the work of other employees, clients, or vendors that restricts production or disrupts normal work environment.
. . . .
12. Insubordination.
. . . .
14. Deliberate misconduct or belligerence in the performance of duties.
[and]
15. Refusal to perform properly assigned work by a supervisor, deliberately delaying or restricting production, or inciting others to delay or restrict work output.

[*Id.* at 10.]

**Plaintiffs' Version of Facts**

Plaintiffs' proposed evidence includes the following version of events:

Ms. Applegate contends that the week of November 25, 2013 was not the first time she had needed help completing the copying task, and that in the past she had frequently requested and been granted help. [R. Applegate Decl., Ex. 5 to Pls.' Opp'n, Doc. 26-10 at ¶ 3.] Because Mr. Monnig did not respond to her request for help on Friday, November 22, 2013, Ms. Applegate again asked for help on Monday, November 25, 2013, and Mr. Monnig told her that he would have two crew leaders to help her make copies on Tuesday. [*Id.* ¶¶ 3, 5.] Accordingly, Ms. Applegate prepared all of the documents for copying, but did not make the copies on Monday. [*Id.* ¶¶ 5-6.] She did not stay overtime on Monday because she had a previously scheduled doctor's appointment. [*Id.* ¶ 6.] Ms. Applegate denies that she failed to meet any "deadline" to have the copies completed by Tuesday morning. [*Id.* ¶ 7.] On Tuesday, Mr. Monnig summoned Ms. Applegate to his office by yelling "RETHA! MY OFFICE!" [R. Applegate Dep., Ex. 7 to Pls.' Opp'n, Doc. 26-12 at 115:10-117:8.] He then accused her of not prioritizing her workload correctly. [*Id.*] Ms. Applegate completed the copying by 2:00 pm on Tuesday, November 26, 2013. [*Id.* at 118:21-22.]

November 27, 2013 – Alleged Yelling in the Office

When Mr. Camper approached Ms. Applegate on Wednesday, November 27, 2013 to inquire about an error on a technician's paperwork, Ms. Applegate told him that she had already found the mistake and corrected it in the master electronic file. [R. Applegate Decl., Ex. 5 to Pls.' Opp'n, Doc. 26-10 at ¶ 9.] Mr. Camper continued to press the issue, asking a second and third time. [*Id.*] Mr. Camper then dropped the paperwork on top of Ms. Applegate's desk and leaned over her through the receptionist window. [*Id.*] Ms. Applegate felt intimidated by Mr. Camper, so she pushed away from the desk and told him to stop and to leave her alone. [*Id.*; R. Applegate Dep., Ex. 7 to Pls.' Opp'n, Doc. 26-12 at 124:4-125:11.] Mr. Camper then smirked and walked away and went to speak with Mr. Monnig. [R. Applegate Decl., Ex. 5 to Pls.' Opp'n, Doc. 26-10 at ¶ 9.]

Shortly thereafter, Mr. Monnig summoned Ms. Applegate to his office by yelling "RETHA! MY OFFICE!" and then told her "No yelling in the office." [R. Applegate Dep., Ex. 7 to Pls.' Opp'n, Doc. 26-12 at 130:10-13; Verified Compl., Doc. 3 at ¶ 26.[1]] Mr. Monnig would not let Ms. Applegate explain what happened, and also refused to let her leave his office when she asked to do so. [R. Applegate Dep., Ex. 7 to Pls.' Opp'n, Doc. 26-12 at 130:24-35; Verified Compl., Doc. 3 at ¶¶ 26-27.] Ms. Applegate felt disoriented and imprisoned in Mr. Monnig's office; she told him that she did not feel well, and said "sorry" in order to get out of the room. [R. Applegate Dep., Ex. 7 to Pls.' Opp'n, Doc. 26-12 at 131:7-20; R. Applegate Decl., Ex. 5 to Pls.' Opp'n, Doc. 26-10at ¶ 15;

---

[1] The court may treat a verified complaint as an affidavit for summary judgment purposes if the complaint satisfies the requirements of Federal Rule of Civil Procedure 56, *i.e.*, it is made on personal knowledge, sets out facts that would be admissible in evidence, and shows that the affiant is competent to testify on the matters stated. *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1019 (10th Cir. 2002).

Verified Compl., Doc. 3 at ¶¶ 27-28.] Mr. Monnig then told her "It's okay. We're all under a lot of stress. We have a four-day weekend coming up. We'll all come back Monday and everything will be fine." [R. Applegate Dep., Ex. 7 to Pls.' Opp'n, Doc. 26-12 at 136:3-7; Verified Compl., Doc. 3 at ¶ 28.] After Ms. Applegate left Mr. Monnig's office, she apologized to Mr. Camper in slurred speech. [R. Applegate Dep., Ex. 7 to Pls.' Opp'n, Doc. 26-12 at 129:12-130:4; Verified Compl., Doc. 3 at ¶ 29.]

Ms. Applegate then returned to Mr. Monnig's office and told him "I don't appreciate the way I've been treated, and this feels just like what happened to Mary Strawn." [R. Applegate Dep., Ex. 7 to Pls.' Opp'n, Doc. 26-12 at 136:18-137:6; Verified Compl., Doc. 3 at ¶ 29.] Mary Strawn, a Heath employee in her sixties, had filed a formal complaint with HR on October 25, 2013, concerning bullying by Mr. Camper. [R. Applegate Decl., Ex. 5 to Pls.' Opp'n, Doc. 26-10 at ¶ 10.] Mr. Camper had a history of berating older female employees, while being more lenient with younger female employees. [*Id.* ¶¶ 10-11.] For example, Mr. Camper had referred to Ms. Applegate as a "damn fucking woman" once when she had locked the front door to the office and he couldn't get inside, and he had referred to Ms. Strawn as "Miss Pushy Pants" once when she asked to work alongside her friend like two younger female employees were permitted to do. [*Id.* ¶ 10; E. Applegate Decl., Ex. 6 to Pls.' Opp'n, Doc. 26-11 at ¶ 3; E. Applegate Dep., Ex. 8 to Pls.' Opp'n, Doc. 26-13 at 106:20-110:2, Verified Compl., Doc. 3 at ¶¶ 12,15.] Ms. Applegate had also overheard Mr. Monnig tell Mr. Camper in reference to Kathy Canfield, a female employee in her sixties, that "[i]f you don't yell at them [older women] they do not do good work," but younger female technicians should not be "talked to" in the same way. [R. Applegate Decl., Ex. 5 to Pls.' Opp'n, Doc. 26-10 at ¶ 11; R. Applegate Dep., Ex. 7 to Pls.' Opp'n, Doc. 26-12

9

at 89:18-25, 99:9-23; Verified Compl., Doc. 3 at ¶ 16.] After telling Mr. Monnig that she did not appreciate how she was being treated, which felt like Ms. Strawn's treatment, Mr. Monnig angrily told Ms. Applegate to call her husband so he could pick her up and take her home. [Verified Compl., Doc. 3 at ¶ 29.]

When Mr. Applegate arrived to take Ms. Applegate home, Ms. Applegate was emotionally distraught as they exited the building, and was "almost collapsing." [E. Applegate Dep., Ex. 8 to Pls.' Opp'n, Doc. 26-13 at 121:15-122:8.] Mr. Applegate went back inside to speak with Mr. Monnig, and told Mr. Monnig "You don't care about your employees. You have no idea how hard she works for you." [*Id.* at 122:9-123:8.] Mr. Applegate only raised his voice "a little bit." [*Id.* at 123:9-12.] His request that Mr. Monnig "step outside" was not a threat of violence. [*Id.* at 128:23-130:7.]

The incident reports completed by various Heath employees about the events of Wednesday, November 27, 2013 do not appear to follow the standard format, and the report completed by Phil Harvey, who witnessed the discussion between Ms. Applegate and Mr. Camper regarding a paperwork error, appears to have been prompted by Heath management—it is dated differently than the other reports and uses language that Mr. Harvey would not normally use himself. [R. Applegate Decl., Ex. 5 to Pls.' Opp'n, Doc. 26-10 at ¶ 12; *see also* Nov. 27, 2013 Incident Reports, Ex. D-1 to Def.'s Mot., Doc. 23-5 at 5.]

December 2-3, 2013 – Suspension and Termination

When Plaintiffs returned to work on Monday, December 2, 2013 (after the Thanksgiving holiday), Mr. Monnig informed them that they were being placed on paid suspension. [R. Applegate Dep., Ex. 7 to Pls.' Opp'n, Doc. 26-12 at 150:12-20.] Mr. Applegate responded twice that "we're not going down without a fight," saying it louder the second time so that others in the office could hear it and be able to document what he said. [*Id.* at 151:3-152:10; E. Applegate Dep., Ex. 8 to Pls.' Opp'n, Doc. 26-13 at 132:8-23.] Although he made the statement loudly, he did not yell. [E. Applegate Decl., Ex. 6 to Pls.' Opp'n, Doc. 26-11 at ¶ 2.] Mr. Applegate was in disbelief that he and his wife had been suspended, in his view wrongfully and discriminatorily. [*Id.*] Mr. Applegate had a discussion with a Heath HR representative, Isaid Gallego, that same day. [E. Applegate Dep., Ex. 8 to Pls.' Opp'n, Doc. 26-13 at 138:19-142:5.] Mr. Gallego informed Mr. Applegate that five witnesses to Mr. Applegate's Wednesday, November 27, 2013 confrontation with Mr. Monnig had provided a different version of the events than Mr. Applegate recalled. [*Id.*] Mr. Gallego called Plaintiffs back later in the day on Monday, December 2, 2017 and told them to report to the office at 8:30 am on Tuesday. [*Id.* at 142:20-143:6.]

When Plaintiffs arrived to work on Tuesday, December 3, 2013, Mr. Monnig immediately notified them that they were terminated, and requested the keys to Mr. Applegate's company car. [*Id.* at 143:9-19.] Ms. Applegate gathered her personal belongings, and said to some Heath employees in the foyer "Gentlemen, I wish you well." [R. Applegate Dep., Ex. 7 to Pls.' Opp'n, Doc. 26-12 at 156:25-158:24.] Plaintiffs inquired how they would get home without the company car, and Mr. Monnig told them that another Heath employee, Luke Langmeyer, would take them. [R. Applegate Dep., Ex. 7 to Pls.'

Opp'n, Doc. 26-12 at 157:14-158:10; E. Applegate Dep., Ex. 8 to Pls.' Opp'n, Doc. 26-13 at 143:23-144:8.] Mr. Applegate did not want to ride home with Mr. Langmeyer, who he was unfamiliar with, and decided to call his son to come get Plaintiffs. [E. Applegate Dep., Ex. 8 to Pls.' Opp'n, Doc. 26-13 at 144:9-147:6.]

At some point, Mr. Applegate asked to call HR and was told that he could not do so from inside the office. [R. Applegate Dep., Ex. 7 to Pls.' Opp'n, Doc. 26-12 at 158:25-159:13; E. Applegate Dep., Ex. 8 to Pls.' Opp'n, Doc. 26-13 at 143:20-22, 147:14-148:10.] Using his own phone, Mr. Applegate began calling HR from inside the office, but then went out to the garage to continue the call. [R. Applegate Dep., Ex. 7 to Pls.' Opp'n, Doc. 26-12 at 159:1-13; E. Applegate Dep., Ex. 8 to Pls.' Opp'n, Doc. 26-13 at 148:7-21.] Mr. Monnig instructed Mr. Camper to call the police because Plaintiffs were not leaving the building, and Mr. Camper did so. [R. Applegate Dep., Ex. 7 to Pls.' Opp'n, Doc. 26-12 at 159:1-19; E. Applegate Dep., Ex. 8 to Pls.' Opp'n, Doc. 26-13 at 148:10-17.]

The police arrived while Plaintiffs were outside the building speaking with HR representative Becky Jimenez by phone. [R. Applegate Dep., Ex. 7 to Pls.' Opp'n, Doc. 26-12 at 159:20-161:22; E. Applegate Dep., Ex. 8 to Pls.' Opp'n, Doc. 26-13 at 148:118-149:7.] Mr. Applegate was frisked, and Ms. Applegate had a "complete mental and physical breakdown" and collapsed. [R. Applegate Decl., Ex. 5 to Pls.' Opp'n, Doc. 26-10 at ¶ 5; R. Applegate Dep., Ex. 7 to Pls.' Opp'n, Doc. 26-12 at 163:3-165:23, 167:16-24; E. Applegate Dep., Ex. 8 to Pls.' Opp'n, Doc. 26-13 at 149:7-9, 156:22-158:11, 162:15-17.] The police called an ambulance, and Ms. Applegate was taken to the hospital. [R. Applegate Dep., Ex. 7 to Pls.' Opp'n, Doc. 26-12 at 165:19-170:20; E. Applegate Dep., Ex. 8 to Pls.' Opp'n, Doc. 26-13 at 162:15-169:14.] Mr. Applegate requested that the officers

12

write an offense report, but the offense report that was written does not include Mr. Monnig's "false imprisonment" of Ms. Applegate in his office the previous Wednesday when Mr. Monnig reprimanded Ms. Applegate for yelling at Mr. Camper. [E. Applegate Dep., Ex. 8 to Pls.' Opp'n, Doc. 26-13 at 153:2-154:17; *see also* R. Applegate Dep., Ex. 7 to Pls.' Opp'n, Doc. 26-12 at 164:17-165:4.]

Upon Plaintiffs' termination, it occurred to Mr. Applegate that age discrimination was the motivating factor. [E. Applegate Decl., Ex. 6 to Pls.' Opp'n, Doc. 26-11 at ¶ 3.] He believed Mr. Camper—a younger employee under forty—wanted Ms. Applegate's "inside position" and Mr. Applegate's company car, both of which Mr. Camper received upon Plaintiffs' termination. [*Id.*; R. Applegate Dep., Ex. 7 to Pls.' Opp'n, Doc. 26-12 at 101:6-102:22.]

<u>Heath Employment Policy</u>

With respect to Heath's employment policy, Plaintiffs contend that there is no evidence that their conduct was not "positive, safe, and efficient." [Pls.' Opp'n, Doc. 26 at 15.] Both Plaintiffs were well-liked by their colleagues, and each received a "satisfactory" performance evaluation in early November 2013, along with a two-percent pay raise. [R. Applegate Decl., Ex. 5 to Pls.' Opp'n, Doc. 26-10 at ¶ 14; E. Applegate Decl., Ex. 6 to Pls.' Opp'n, Doc. 26-11 at ¶ 4.] Plaintiffs also note that neither Mr. Camper's reference to Ms. Applegate as a "damn fucking woman" nor Mr. Camper's bullying as formally reported by Ms. Strawn resulted in Mr. Camper's termination. [Pls.' Opp'n, Doc. 26 at 14.]

**Analysis**

To prove their claim of an ADEA violation, Plaintiffs must provide sufficient evidence to persuade a reasonable jury that their ages were the determining factor in the termination decision. *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009).

That decision appears to have been made impulsively and lacking in fairness to the Applegates considering their years of satisfactory service. They both had received satisfactory evaluations and a two-percent pay raise in November, the month before the termination. They have met the minimal requirements for a *prima facie* case of age discrimination, but have failed to make a sufficient showing that the reasons given for their termination were a pretext to mask such discrimination.

Workplace violence has become a matter of increased concern in recent years given the news reports of shooting incidents. From Retha Applegate's perspective, she was sent home on Wednesday, November 27, 2013 after referring to Mary Strawn's treatment. That statement could not be considered a plausible reason for finding that Mr. Monnig was age-biased or acting in retaliation. Defendant Heath has shown that Mr. Monnig was attempting to de-escalate the tension within the office, as shown by Retha Applegate's testimony as to what Mr. Monnig said to her prior to the Mary Strawn reference. [*See* R. Applegate Dep., Ex. 7 to Pls.' Opp'n, Doc. 26-12 at 136:3-7 ("It's okay. We're all under a lot of stress. We have a four-day weekend coming up. We'll all come back Monday and everything will be fine.").] Unfortunately, that attempt failed when Ernest Applegate responded aggressively. His reaction raised a reasonable basis for the belief that the safety of Mr. Monnig and other Heath employees was threatened.

14

The decision to fire Mr. Applegate was a legitimate business decision. It may be argued that Ms. Applegate posed no threat, but the decision to treat the couple the same was a business decision that this Court cannot review for reasonableness. Plaintiffs have failed to show that their work environment was hostile toward older employees or that the reference to Mary Strawn was sufficient to infer retaliation for supporting Ms. Strawn's complaints. Any purported institutional age bias by Heath is negated by the fact that both plaintiffs were hired when they were older than fifty.

The analysis of Plaintiffs' CADA claim does not differ from the ADEA analysis. *See Bodaghi v. Dep't of Natural Res.*, 995 P.2d 288, 297 (Colo. 2000); *Colo. Civil Rights Comm'n v. Big O Tires, Inc.*, 940 P.2d 397, 399 (Colo. 1997).

**Order**

Upon the foregoing, it is hereby

ORDERED that Defendant's motion for summary judgment [Doc. 23] is GRANTED, and the clerk shall enter judgment for Heath Consultants, Inc. dismissing this action, with an award of costs.

DATED: August 1, 2017        BY THE COURT:

s/Richard P. Matsch

Richard P. Matsch, Senior District Judge